UNITED STATES v. WINONA & ST. P. R. CO. et al.

(Circuit Court of Appeals, Eighth-Circuit. May 6, 1895.)

No. 564.

**1. LAND DEPARTMENT OF THE UNITED STATES—JUDICIAL POWER.**

The land department of the United States (including in that term the secretary of the interior, the commissioner of the general land office, and their subordinates) is a special tribunal, vested with judicial power to hear and determine the claims of all parties to the public lands which it is authorized to dispose of, and also with power to execute its judgments by conveyances to the parties it decides are entitled to them.

**2. CERTIFICATION OF TITLE UNDER A RAILROAD LAND GRANT—EFFECT.**

A certification of land to the state for the benefit of a railroad company under the acts of March 3, 1857 (11 Stat. 195), of May 12, 1864 (13 Stat. 72), and of March 3, 1865 (13 Stat. 526), by the land department of the United States, has the same legal effect as a patent.

**3. PATENT TO LAND—LEGAL EFFECT.**

A patent or certificate of title to land within its jurisdiction issued by the land department is a judgment of that tribunal and a conveyance of the legal title.

**4. PATENT TO LANDS WITHOUT THE JURISDICTION OF THE LAND DEPARTMENT—EFFECT.**

A patent or certificate of the land department for land over which that tribunal has no power of disposition, and no jurisdiction to determine the claims of applicants for, is absolutely void, and conveys no title. Land the title to which had passed from the government to another before the claim on which the patent was based was initiated, land reserved from sale and disposition by the land department for military or other like purposes, land reserved by a claim under a Mexican or Spanish grant sub judice, and land for the disposition of which the acts of congress have made no provision, is of this character.

**5. PATENT TO LAND WITHIN THE JURISDICTION OF THE LAND DEPARTMENT—EFFECT.**

A patent or certificate of the land department for land over which that department has the power of disposition, and the jurisdiction to determine the claims of applicants for, is impervious to collateral attack, and conveys the legal title, whether its decision upon the rights of the applicants is right or wrong.

**6. CANCELLATION OF PATENTS ERRONEOUSLY ISSUED — POWER OF COURT OF EQUITY.**

A court of equity may, in a direct proceeding for that purpose, set aside a patent or certificate, or declare the legal title under it to be held in trust for one who has a better right to it, in cases in which the action of the land department over a matter within its jurisdiction has resulted from fraud, mistake, or erroneous views of the law.

**7. CERTIFICATION OF LANDS THROUGH MISTAKE OF LAW—EFFECT.**

Under the act of March 3, 1857, as amended by the act of March 3, 1865, supra, the land department, through a mistake of law, certified to the state of Minnesota, for the benefit of a beneficiary of those acts, lands within the primary limits of its grant, which were subject to homestead entries and pre-emption filings at the time of the definite location of its line of railroad, which had been duly canceled by a proper officer of the land department before the certificates were made. *Held*, that the land department had jurisdiction of the subject-matter of the certificates; and, although its decision was erroneous, the certificates were not absolutely void, but merely voidable, and they conveyed the legal title to the state and its grantees.

**8. BONA FIDE PURCHASERS.**

In a suit in equity brought by the United States under the act of March 3, 1887 (24 Stat. 556), to cancel such certificates, and to restore the title to

the land to the United States, the equities of bona fide purchasers who hold the legal title under the certificates are superior to those of the United States, and constitute a good defense to the suit.

**9.** SAME—NECESSARY PARTIES.

Such purchasers who hold the legal title are indispensable parties to a suit in equity to annul that title.

**10.** SAME—CONSIDERATION.

The complete satisfaction and discharge of an existing indebtedness is a sufficient and valuable consideration for the purchase of land or other property.

**11** LAND GRANTS—EXCEPTIONS FROM LANDS GRANTED IN PLACE.

Lands within the place limits of the grants to a beneficiary of the acts of March 3, 1857, May 12, 1864, or March 3, 1865, supra, which are sold or otherwise appropriated, or to which pre-emption rights are attached at the time of the definite location of the line of its railroad, are excepted from the grant to that company.

**12.** SAME—EXCEPTIONS FROM LANDS GRANTED IN INDEMNITY LIMITS.

Lands within the indemnity limits of the grant to a beneficiary of the acts of March 3, 1857, May 12, 1864, or March 3, 1865, supra, which were sold or otherwise appropriated, or to which pre-emption rights had attached at the time of their selection and its approval, and those only, are excepted from the lands within the indemnity limits granted to such a beneficiary.

**13.** SAME—EXCEPTIONS.

Accordingly, lands within the place limits of the grant for the Winona Company and within the indemnity limits of the grant to the Sioux City Company under those acts, to which homestead entries and pre-emption filings, that were subsequently canceled by the proper officer of the land department, were attached at the time of the definite location of the line of the railroad of the Winona Company, were excepted from the grant of lands in place to that company, and, after such cancellations were made, were rightfully selected and certified to the Sioux City Company as a part of its indemnity lands.

Appeal from the Circuit Court of the United States for the District of Minnesota.

Robert G. Evans, for the United States.

Thomas Wilson (Lloyd W. Bowers, on the brief), for appellees Winona & St. P. R. Co. and Minnesota Land & Investment Co.

J. A. Tawney and H. M. Lamberton, for appellee Winona & St. P. Land Co.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. In this case, the appellant, the United States, brought a suit in equity in the circuit court against the Winona & St. Peter Railroad Company, a corporation, and more than 35 of its immediate and remote grantees, to set aside the certification from the United States to the state of Minnesota of about 2,380 acres of land, and to annul the conveyances thereof by the state to the railroad company. This suit was brought under the provisions of the act of congress of March 3, 1887 (24 Stat. c. 376, p. 556), to provide for the adjustment of land grants in aid of the construction of railroads. It was grounded on the fact that, at the respective times of the definite location of the railroad of the Winona Company, homestead entries or pre-emption filings had been made upon the lands described in the bill, so that, according

to the decision of the supreme court in Railway Co. v. Dunmeyer, 113 U. S. 629, 641, 644, 5 Sup. Ct. 566, these lands were excepted from the grant to the state for the benefit of the railroad company. The existence of the homestead entries and pre-emption filings, when the line of the railroad was definitely fixed, was conceded by the appellees; and their defense was that the certification of the lands to the state, although erroneous, was not void, but conveyed the legal title; that the appellees, other than the railroad company, had become the bona fide purchasers of all but 240 acres of this land, in reliance upon this certificate, before the government made any claim to recover it; that the 240 acres which were still held by the railroad company were rightfully certified to the state for the benefit of the St. Paul & Sioux City Railroad Company, another corporation; and hence that there was no equity in the bill.,

In the view we take of this case, the material facts disclosed at the hearing are these: The lands in question were certified to the state under the provisions of the following acts of congress, viz.: The act of March 3, 1857 (11 Stat. c. 99, p. 195), which granted to the territory of Minnesota, for the purpose of aiding in the construction of certain railroads, including that of the Winona Company and that of the St. Paul & Sioux City Railroad Company, every alternate section of land designated by odd numbers for 6 sections in width on each side of each of said roads, and provided that in case it should appear that the United States had, when the lines or routes of said roads were definitely fixed, sold any sections or parts of sections granted, or that the right of pre-emption had attached to the same, then lands in lieu of those so sold or pre-empted might be selected from alternate sections of the public domain within 15 miles of the lines of said roads; the act of congress approved March 3, 1865 (13 Stat. c. 105, p. 526, §§ 1, 2), which increased the quantity of lands granted by the act of March 3, 1857, to aid in the construction of the railroad of the Winona Company to 10 sections per mile, extended the indemnity limits of the grant to 20 miles, and provided that the lands granted by that act and by the act of March 3, 1857, should "in all cases be indicated by the secretary of the interior"; and the act of May 12, 1864 (13 Stat. 72), which granted to the state of Minnesota, for the purpose of aiding in the construction of the railroad of the St. Paul & Sioux City Railroad Company, 4 additional sections per mile, to be selected within 20 miles of the line of said railroad, upon the same conditions, restrictions, and limitations as were contained in the act of March 3, 1857. The line of the railroad of the Winona Company was definitely fixed from its eastern terminus westerly to the west line of range 31 on July 29, 1858, to the west line of range 37 as early as August 3, 1864, and to the west line of range 38 on February 23, 1867. The line of the railroad of the Sioux City Company was definitely fixed from its eastern terminus to section 31, township 107, range 31, on February 20, 1858; and thence westerly to section 30, township 104, range 39, on August 10, 1865. Both of these railroad companies built their railroads in a time and manner that entitled

them to the benefit of the acts of congress cited, so far as those acts and the timely construction of their railroads conferred upon them any right to these lands; and the railroad of the Winona Company was built past all and across some of these lands before the year 1873. All of these lands were certified to the state before June 7, 1879, and all but 680 acres of them before May 15, 1874. A part of them were certified to the state for the benefit of the Winona Company, and a part were certified to the state for the benefit of the Sioux City Company. Those certified for the benefit of the Winona Company were conveyed to that company by the state prior to 1880. The lands certified to the state for the benefit of the St. Paul & Sioux City Railroad Company were within the place limits of the Winona Company and within the indemnity limits of the Sioux City Company. When the line of the railroad of the Winona Company was definitely fixed opposite to them, they were subject to homestead entries or pre-emption filings, which were subsequently canceled by the proper officer of the land department of the United States. After these entries and filings had been canceled, the Sioux City Company selected these lands as indemnity lands under its grants, and they were thereupon certified to the state for its benefit. There was such a deficiency in the lands in place granted to the Sioux City Company that all the public lands within its indemnity limits were required to fill it. In 1875, before the governor of the state had conveyed these lands to the Sioux City Company, the Winona Company brought suit against it for an injunction, forbidding that company to apply to or to receive from the governor of the state a conveyance of any of these lands, and for a decree that the Winona Company was justly entitled to them, and to a conveyance of them from the state. In 1885 the Winona Company succeeded in obtaining a final decision of the supreme court entitling it to this relief (St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 720, 5 Sup. Ct. 334); and the governor of the state thereupon conveyed these lands to the Winona Company. On October 31, 1867, D. N. Barney and eight other persons owned the stock of the Winona Company. These persons had, at the request of the company, loaned to it large sums of money, and had constructed 105 miles of its railroad from Winona to Waseca, Minn. In payment of this loan and for the construction of this railroad, the corporation on that day agreed to deliver to these men certain amounts of its stock and bonds, and sold and agreed to convey to them, or to the parties to whom they directed it to convey, as many acres of land as the corporation should receive on account of the construction of that 105 miles of railroad, and to convey in satisfaction of this contract all the lands it should receive within its 20-mile limits, commencing at the eastern terminus of its railroad, and running westerly until the full quantity was conveyed, excepting, however, such portions of said lands as were necessary to the operation of its railroad. At the same time, and as a part of the same transaction, Barney and his associates sold their stock in the Winona Company to parties in

control of the Chicago & Northwestern Railway Company, and the sale of and agreement to convey these lands were part of the consideration for the sale of the stock. Some of the lands covered by this contract were sold to innocent third parties before 1876. In that year, the appellee the Winona & St. Peter Land Company, a corporation, was organized with a capital stock of $500,000; and, with this stock, it bought the unsold lands covered by the contract of October 31, 1867, and the obligations of the purchasers of the lands sold by Barney and his associates, for the unpaid purchase price thereof. Prior to 1878 the Winona Railroad Company conveyed to the parties designated by Barney and his associates all the lands in controversy, except 240 acres in range 38, which had been certified to the Sioux City Company, and except those which the Winona Company conveyed to the land company on November 20, 1887, in obedience to the decision of the supreme court of the United States in Railroad Co. v. Barney, 113 U. S. 618, 5 Sup. Ct. 606, and Barney v. Railroad Co., 117 U. S. 228, 6 Sup. Ct. 654. In 1878 Barney and his associates commenced a suit in the proper court in the state of Minnesota to compel the Winona Railroad Company to convey the lands last mentioned to them, or to the parties they designated, under the contract of October 31, 1867. That suit was removed to the United States circuit court for the district of Minnesota, where a decree was rendered in April, 1881, that the Winona Company should convey these lands under the contract to the complainants in that suit, or to the parties they might designate. In 1886 this decree was affirmed on appeal by the supreme court; and on November 20, 1887, the Winona Company conveyed these lands to the Winona & St. Peter Land Company pursuant to that decree.

According to the uniform decisions of the officers of the land department of the United States, from the passage of the acts of congress under which these lands were certified to these railroad companies until the decision of the supreme court, in 1884, in Railway Co. v. Dunmeyer, 113 U. S. 641, 5 Sup. Ct. 566, these lands fell under the grant to the Winona Company, when the pre-emption filings and homestead entries upon them at the time the lines of the railroads were definitely fixed were subsequently canceled by the proper officers of the land department; and, according to these decisions, they were properly certified to the state for the Winona Railroad Company. But that was an erroneous view of the law. Railway Co. v. Dunmeyer, supra. Neither Barney nor any of his associates, nor the land company nor any of the appellees who purchased from any of them, discovered this error or received notice of any claim of the United States to any of these lands or of any defect in the title to them until about March, 1891, when the United States demanded the reconveyance of them from the railroad company under the act of 1887. In the meantime many tracts of these lands had been sold by Barney and his associates and by the land company, and they were then held under deeds and contracts from them by their immediate and remote grantees, many of whom had paid taxes and made valuable improvements upon the lands. The land company itself had paid taxes upon

them to the amount of $7,993.33. There never had been any final adjustment of these land grants between the United States and the railroad companies. Upon this state of facts the court below dismissed the bill.

The determination of the questions presented by four of the alleged errors assigned by the appellant will be decisive of this case. These errors are: (1) That the court below erred in holding that the action of the officers of the land department in certifying to the state of Minnesota for the benefit of the Winona Railroad Company the lands within the place limits of its grants on which homestead entries or pre-emption filings, which had subsequently been canceled, existed at the time of the definite location of its line, though erroneous, was not absolutely void, but was merely voidable at the suit in equity of the party who had the better right to the title, and that the certificates those officers issued conveyed the legal title to the state and its grantees. (2) That the circuit court erred in holding that the United States had no equitable right to these lands superior to that of the bona fide purchasers who had acquired this legal title before the United States gave any notice of their mistake or of its claim to recover the lands. (3) That the court below erred in holding that the immediate and remote grantees of the Winona Railroad Company, who were parties to this suit, were bona fide purchasers of the lands bought by them respectively. (4) That the court erred in holding that the lands within the place limits of the grants to the Winona Company, and within the indemnity limits of the grants to the Sioux City Company, upon which homestead entries and pre-emption filings, that were subsequently canceled by the proper officer of the land department, existed at the time of the definite location of the line of the railroad of the Winona Company, were, after these cancellations were made, properly selected and rightfully certified to the Sioux City Company by the officers of the land department.

This is one of five cases argued at the last term in which the questions presented by the first three errors assigned arise. In some of these cases the question is mooted whether or not a pre-emption right attached to any of the public land, within the meaning of the congressional land grants, by the mere filing of a declaratory statement in a case in which the pre-emptor never settled upon the land, or otherwise complied with the law relative to pre-emption rights. This question and the cognate question whether or not the railroad company or its grantees are entitled to question the attachment of the pre-emption right at all, when the declaratory statement was filed on a tract of land at the time the railroad company definitely located its line, it has been unnecessary for us to consider in reaching a satisfactory decision of these cases, and we express no opinion upon them. For the purpose of the determination of these cases, we concede to the United States, but we do not decide, that the existence of a pre-emption filing upon a tract of land at the time of the definite location of the line of a land-grant railroad, excepted the tract from the grant to the railroad company to the same extent as the existence of a homestead entry upon it would have done. Under this concession

it must be admitted that the decision of the officers of the land department, evidenced by their certificates, that the grants to the Winona Railroad Company attached to the lands in controversy, was erroneous. They should have held that these lands were excepted from these grants by the existence of the homestead entries and pre-emption filings upon them when the line of the railroad was definitely located, and that these lands did not fall within the grants to that company when the entries and filings were subsequently canceled. Railway Co. v. Dunmeyer, 113 U. S. 641, 5 Sup. Ct. 566; Burr v. Greeley, 3 C. C. A. 357, 52 Fed. 926, and 10 U. S. App. 409. But was the decision and judgment of these officers void or only voidable? Counsel for the government insist with great earnestness that the cases just cited conclusively answer this question and preclude further discussion. A careful examination of the opinions, however, has led us to the conclusion that these cases are not decisive of, and that they are hardly persuasive upon, this question. A determination of it was not necessary to the decision of either of the cases, so that whatever was said concerning it was obiter dicta. In Railway Co. v. Dunmeyer no certificate or patent had issued to the railroad company, but a patent had issued to an adverse claimant of the land. The action was for the breach of a covenant in a deed made by a grantee of the railroad company, and it was sustained on the ground that the railroad company never had any title, and the patentee had. In Burr v. Greeley, a remote grantee under the railroad company, who was in possession of the land, claiming from the United States the rights of a bona fide purchaser under the act of 1887, brought an action against his grantor for breach of covenant, on the ground that the railroad company never had any title, because pre-emption rights had attached to the land at the time of the definite location of the line of the railroad. This court held that the plaintiff could not maintain his action, because he could not retain the benefits given to him as a bona fide purchaser from the railroad company or its grantee, under the act of 1887, and at the same time recover for a breach of the covenant in his deed. In this case patents or patent certificates had been issued to the state for the railroad company, and it is stated in the opinion that these patents were void, and that purchasers under them acquired no title. But it is obvious that the decision must have been the same whether the patents were void or voidable. That question was not material to the decision, and what was said upon it was unnecessary to the determination of the case. Moreover, it is a common practice of legislatures and courts to use the words "void" and "voidable" interchangeably where the distinction between them is not material to the question or case under consideration; and it was in this way that the word "void" was used in Burr v. Greeley. The question now before us was neither argued, considered, nor decided in that case, and we enter upon its consideration in this case for the first time.

The question is, were the certificates of the officers of the land department absolutely void, so that they conveyed no title, legal or equitable, and so that they were constantly open to collateral attack?

All the lands certified for the Winona Company were within the place limits of its grants. The grants were in praesenti, and they attached upon the filing of its maps of the definite location of its line opposite to the lands. The certificates were evidence that the officers of the land department had adjudged that the grants to the Winona Railroad Company had attached to the lands in controversy, and their legal effect was the same as though patents to the state had been issued for the benefit of that company. Frasher v. O'Connor, 115 U. S. 102, 116, 5 Sup. Ct. 1141; Curtner v. U. S., 149 U. S. 662, 675, 13 Sup. Ct. 985, 1041. A patent issued by the officers of the land department of the United States, in a case within the scope of their power or jurisdiction, is dual in its effect: It is an adjudication of those officers that the patentee is entitled to the land under the laws of the United States, and it is a conveyance of the title to that land to the patentee. By the act of March 3, 1849 (9 Stat. c. 108, p. 395, § 3; Rev. St. § 441), the secretary of the interior is charged with the supervision of the public business of the United States relating to the public lands; and by the act of March 3, 1857, supra, as amended by the act of May 12, 1864, supra, the power was conferred and the duty imposed upon him to indicate the lands granted to the Winona Railroad Company by those acts of congress in all cases. By the act of July 4, 1836 (5 Stat. c. 352, § 1; Rev. St. § 453), the commissioner of the general land office is required to "perform, under the direction of the secretary of the interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in any wise respecting such public lands, and also such as relate to private claims of land, and the issuing of patents for all [agents] [grants] of land under the authority of the government." The land department of the United States, then, including in that term the secretary of the interior, the commissioner of the general land office, and their subordinate officers, constitutes a special tribunal, under these and other provisions of the laws of the United States, vested with the judicial power to hear and determine the claims of all parties to the public lands it is authorized to dispose of, and to execute its judgments by conveyances to the parties entitled to them. When a claim under a grant for a railroad company is made to a portion of the public lands under its control, that tribunal must determine whether or not the claimant is the beneficiary of the grant, whether or not it has so far complied with its conditions that it is entitled to its benefits, whether or not the public land claimed is a portion of the grant, and whether or not any other party has a superior right to it. When a claim is made under the homestead or pre-emption laws for a portion of the public domain that is subject to its disposition, that tribunal must determine whether or not the claimant is qualified to acquire lands under the terms of those laws, whether or not the land claimed was subject to pre-emption or to entry for a homestead, and whether or not the claimant has so complied with the requirements of those laws as to entitle him to the title to the land. Similar questions must be heard and determined by that department whenever any portion of the public land subject to disposition by that tribunal is sold or otherwise disposed

of in any way. In every case there must, in the nature of things, be a decision of questions of fact and of questions of law, because in every case the ultimate question is whether or not the facts proved show that the claimant is entitled to the land, under the acts of congress. A certificate or patent is the record evidence of the judgment of this tribunal, and it necessarily follows that, when such a judgment is rendered in a case within the jurisdiction of the land department, it is, like the judgments of other special tribunals, vested with judicial powers, impervious to collateral attack.

As was said in Moore v. Robbins, 96 U. S. 530, 533:

"It is a part of their [the officers of the land department's] daily business to decide when a party has, by purchase, by pre-emption, or by any other recognized mode, established a right to receive from the government a title to any part of the public domain. This decision is subject to an appeal to the secretary, if taken in time. But if no such appeal be taken, and the patent issued under the seal of the United States, and signed by the president, is delivered to and accepted by the party, the title of the government passes with this delivery."

These propositions are not seriously questioned by counsel for the government, but his contention is that the land department was without jurisdiction to decide whether these lands fell within the grants to the railroad company, and rightly belonged to it, or were excepted from these grants, and were open to pre-emption, homestead, and purchase by other parties; and he maintains that, since this department was without jurisdiction to decide this question, the certificates to the state which it delivered were issued without authority, and were absolutely void. In support of these views, he has cited many authorities from the decisions of the supreme court, but a careful examination of these decisions has convinced us that they do not rule this case. They are cases in which the power to hear and determine the claims of the parties to the land in controversy, and to convey it to the rightful claimant, was not vested in the land department when it rendered its decision and made its conveyance. They are cases in which the title to the land patented or certified had passed out of the government, and hence was not within the jurisdiction of the officers of the land department when that tribunal decided and attempted to convey it, as in Polk v. Wendal, 9 Cranch, 87; Stoddard v. Chambers, 2 How. 284, 318; Easton v. Salisbury, 21 How. 426, 432; Reichart v. Felps, 6 Wall. 160; Best v. Polk, 18 Wall. 112, 117, 118; Sherman v. Buick, 93 U. S. 209; Iron Co. v. Cunningham, 15 Sup. Ct. 103; or cases in which the land was reserved from sale or disposition by the land department until a claim under a Mexican or Spanish grant should be determined, and the power to determine the extent and validity of this claim had been conferred upon tribunals other than the land department, and the final decisions of those tribunals had not been made when the claim of the patentee was initiated, as in Doolan v. Carr, 125 U. S. 618, 624, 632, 8 Sup. Ct. 1228; or cases in which the land had been set apart as a portion of a military or other like reservation, and had thus ceased to be a part of the public domain, subject to sale or other disposition by the officers of the land department, as in U. S. v. Stone, 2 Wall. 525, 527, and Wilcox v. Jack-

son, 13 Pet. 499, 511. In all these cases the land that was the subject-matter of the patents or certificates, and the rights of the claimants to it, were not subject to the jurisdiction of the land department. That department had no jurisdiction to hear and determine these claims, or upon such determination to dispose of the lands. On the other hand, in every case to which our attention has been called in which the power to hear and determine the claims of applicants for lands of the United States, and upon such determination to dispose of those lands, either under the pre-emption or homestead laws, under grants for railroads or other corporations, or by sale, or in any other recognized mode, has been vested in the land department, the supreme court has uniformly held that the patent or certificate issued from the department conveyed the legal title, and was not subject to collateral attack. Minter v. Crommelin, 18 How. 87, 89; U. S. v. Schurz, 102 U. S. 378, 401; French v. Fyan, 93 U. S. 169, 172; Quinby v. Conlan, 104 U. S. 420; Smelting Co. v. Kemp, 104 U. S. 636, 645-647; Steel v. Refining Co., 106 U. S. 447, 450, 452, 1 Sup. Ct. 389; Heath v. Wallace, 138 U. S. 573, 585, 11 Sup. Ct. 380; Knight v. Association, 142 U. S. 161, 212, 12 Sup. Ct. 258; Noble v. Railroad Co., 147 U. S. 174, 13 Sup. Ct. 271; Barden v. Railroad Co., 154 U. S. 288, 14 Sup. Ct. 1030.

The distinction between the two classes of cases is well illustrated by Best v. Polk, 18 Wall. 112, 117, 118, and Minter v. Crommelin, 18 How. 89. In the former case a tract of land was sold by the land department, and patented to a purchaser in 1847. But a Chickasaw chief had perfected his title to this land in 1839, under the provisions of a treaty between the United States and the Chickasaw Indians. The supreme court held the patent void, because the title to the land had passed out of the United States before the claim of the patentee was initiated, and hence the officers of the land department had no jurisdiction over the subject-matter of the patent. But in the latter case the land patented to a pre-emptor had been reserved by act of congress to a Creek warrior, but the act provided that, if the warrior abandoned his reservation, it should be forfeited, and the secretary of the interior might order its sale. The supreme court held that the patent was prima facie evidence that the warrior had abandoned his reservation, that the secretary had ordered the sale, and that the legal title had passed to the pre-emptor.

Another striking illustration of this distinction is found in Doolan v. Carr, 125 U. S. 618, 630, 8 Sup. Ct. 1228, and Quinby v. Conlan, 104 U. S. 420. In the former case, the plaintiff, Carr, brought ejectment in reliance upon a title derived from a patent issued to the Central Pacific Railroad Company in 1874 under the Pacific Railroad acts. Those acts excepted from their grants to the railroad company the lands claimed under Mexican or Spanish grants. By the act of March 3, 1851 (9 Stat. 632), a commission had been created to determine the extent and validity of such claims under Mexican grants. An appeal was allowed by that act from the decision of the commission to the district court of California, and

from the decision of that court to the supreme court of the United States. The land patented to the Central Pacific Railroad Company in that case was within the limits of a claim under a Mexican grant, which was in litigation before some of these tribunals when the grants were made to the Central Pacific Railroad Company, and when the line of its railroad was definitely fixed, and the claim under the grant was finally sustained by the supreme court long after those dates. The jurisdiction to hear and determine the claim to this land under the Mexican grant had been conferred by this act of congress upon tribunals other than the land department; and the court held that the patent to the railroad company issued by that department was absolutely void, and its action in the premises without jurisdiction or authority. But in Quinby v. Conlan (an action of ejectment) the patent under which the plaintiff claimed was attacked by an attempt to show that the land was within a reservation under a Mexican grant when the rights of the pre-emptor were initiated. The determination of that question depended upon whether or not the public surveys had been extended over the land, and whether or not other land had been taken by the claimant under the Mexican grant in satisfaction of it. The supreme court held that the patent was a conclusive determination of this question, and could not be collaterally attacked, because "the question whether the land had been so freed from the reservation under the Mexican grant as to be open to settlement and pre-emption depended upon matters disclosed by records of proceedings in the land department," and that department had the jurisdiction to determine those questions.

In Steel v. Refining Co., 106 U. S. 447, 451, 1 Sup. Ct. 389 (an action of ejectment), the plaintiff's title depended upon a patent issued upon a claim for mineral lands within the limits of a townsite; and the defense was that the patent was void because the land was not mineral, and the patentee was not a citizen, and had not declared his intention to become one. The supreme court held that proof of these facts was inadmissible to attack the patent, and declared that the land department "must necessarily consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is unassailable, except by direct proceedings for its annulment or limitation." To the same effect are Heath v. Wallace, 138 U. S. 573, 575, 11 Sup. Ct. 380, and Barden v. Railroad Co., 154 U. S. 288, 14 Sup. Ct. 1030.

In French v. Fyan, 93 U. S. 169, 172, the supreme court held that parol evidence was inadmissible to show that land patented to the state of Missouri as swamp and overflowed land never was in fact swamp or overflowed land, and that, therefore, the patent was void.

In Ehrhardt v. Hogaboom, 115 U. S. 67, 69, 5 Sup. Ct. 1157, that court held that parol evidence was inadmissible to show that land patented to a pre-emptor was swamp or overflowed land, and was

therefore included in the grant to the state of California, and that the patent to the pre-emptor was consequently void. The supreme court held in these cases that the acts of congress devolved upon the land department the duty and conferred upon it the power to determine what lands were of the description granted by the acts of congress, and that its decision on that subject was impregnable to collateral attack.

These authorities, and those above cited which we have not reviewed, perhaps sufficiently illustrate the distinction between the cases in which the land department has acted upon a subject-matter within and one without its jurisdiction. A careful study and analysis of these decisions will show that none of them are inconsistent with the following rules: (1) A patent or certificate of the land department to land, over which that department has no power of disposition and no jurisdiction to determine the claims of applicants for, under the acts of congress, is absolutely void, and conveys no title whatever. Land the title to which had passed from the government to another party before the claim on which the patent is based was initiated, land reserved from sale and disposition for military and other like purposes, land reserved by a claim under a Mexican or Spanish grant sub judice, and land for the disposition of which the acts of congress have made no provision, is of this character. Polk v. Wendal, 9 Cranch, 87, and cases cited under it supra. (2) A patent or certificate of the land department to land over which that department has the power of disposition and the jurisdiction to determine the claims of applicants for, under the acts of congress, is impregnable to collateral attack, whether the decision of the department is right or wrong, and it conveys the legal title to the patentee or to the party named as entitled to that title in the patent or certificate. Minter v. Crommelin, 18 How. 87, 89, and cases cited under it supra. (3) A court of equity may, in a direct proceeding for that purpose, set aside such a patent or certificate, or declare the legal title under it to be held in trust for one who has a better right to it, in cases in which the action of the land department has resulted from fraud, mistake, or erroneous views of the law. Bogan v. Mortgage Co., 11 C. C. A. 128, 63 Fed. 192, 195; Cunningham v. Ashley, 14 How. 377; Barnard's Heirs v. Ashley's Heirs, 18 How. 43; Garland v. Wynn, 20 How. 6; Lytle v. State, 22 How. 193; Lindsey v. Hawes, 2 Black, 554, 562; Johnson v. Towsley, 13 Wall. 72, 85; Moore v. Robbins, 96 U. S. 538; Bernier v. Bernier, 147 U. S. 242, 13 Sup. Ct. 244; Mullan v. U. S., 118 U. S. 271, 278, 279, 6 Sup. Ct. 1041; Moffat v. U. S., 112 U. S. 24, 5 Sup. Ct. 10.

It is not difficult to determine whether the certificates issued in this case were void or voidable when tested by these rules. Jurisdiction of the subject-matter is the power to deal with the general abstract question, to hear the particular facts in any case relating to this question, and to determine whether or not they are sufficient to invoke the exercise of that power. The test of jurisdiction is whether the tribunal has power to enter upon the inquiry,

not whether its conclusion in the course of it is right or wrong. Foltz v. Railway Co., 8 C. C. A. 635, 60 Fed. 316, 318, and cases cited.

When these certificates were issued, the Winona Railroad Company had undoubtedly applied to the land department for conveyances of the lands in controversy to the state for its benefit. These lands were a part of the public lands of the United States, the disposition of which had been intrusted to that department by the acts of congress which established it and defined the powers and duties of its officers. Moreover, the acts of congress under which the Winona Company claimed these lands expressly provided, as we have seen, that the secretary of the interior should indicate the lands granted under them in all cases. The conclusion is irresistible that these acts conferred the power and imposed the duty upon the officers of the land department to hear and determine the ultimate question whether or not the railroad company was entitled to these lands under its grants, and to "indicate" the lands granted by certificates or patents to the state. In no other way could they have discharged the duties these acts imposed upon them. In deciding this question they necessarily considered whether or not the railroad company had so far complied with the acts granting the lands that it had earned them, the character of the lands themselves, and the class to which they belonged, the time of the definite location of the line of the railroad, the homestead entries and pre-emption filings that were then upon the lands, the cancellation of all these entries and filings that had been made, and, finally, the legal effect of all these and all other material facts upon the claim of the railroad company to receive the lands under the acts of congress. It now appears that they were mistaken as to the legal effect of these facts, but the question they decided was one which the acts of congress authorized and required them to decide,—one which they were obliged to decide before they issued the certificates; and, although their decision and their conveyances evidenced by these certificates may be voidable, they are not absolutely void. They are impregnable to collateral attack, and they conveyed the legal title to the lands to the state and its grantees.

The next question is whether or not the United States had any equitable right to these lands superior to that of bona fide purchasers who acquired the legal title to them from the railroad company before the government gave any notice of the mistake of its officers, or of its claim to recover the lands. This is not a debatable question. The equities of the United States appeal to the conscience of the chancellor with the same, but with no greater or less force than would those of an individual under like circumstances. Bona fide purchasers are the especial favorites of courts of equity. In Boone v. Chiles, 10 Pet. 177, 209, Mr. Justice Baldwin, in delivering the opinion of the supreme court, said: "A court of equity can act only on the conscience of a party. If he has done nothing that taints it, no demand can attach upon it, so as to give any jurisdiction. Sugd. Vend. 722. Strong as a plaintiff's equity may be, it can in no case be stronger than that of a purchaser who has put himself in peril by purchasing a title, and paying a valuable consideration, without notice of any de-

fect in it or adverse claim to it; and when, in addition, he shows a legal title from one seised and possessed of the property purchased, he has a right to demand protection and relief (9 Ves. 30–34), which a court of equity imparts liberally."

In U. S. v. Burlington & M. R. R. Co., 98 U. S. 334, 342 (a suit in equity, brought by the United States to annul certain patents issued by it to the railroad company, for alleged errors of the land department in the construction of the acts of congress under which the patents were issued), Mr. Justice Field, in delivering the opinion of the supreme court, declared that the government "certainly could not insist upon a cancellation of the patents so as to affect innocent purchasers under the patentees." To the same effect are U. S. v. California & O. Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458, and U. S. v. Wenz, 34 Fed. 154.

The equitable right of the United States to recover these lands is not exceptionally strong in this case. If its land department had decided that the railroad was not entitled to them when it decided to the contrary, the company would have been entitled to an equal number of acres within its indemnity limits in lieu of them, so that the company obtained no more land than it was entitled to, although what it did obtain was undoubtedly somewhat more valuable than the land within its indemnity limits which it should have received. But the right of the government, in order to secure this difference in value, to recover these lands now, when lands in lieu of them can no longer be found within the indemnity limits to fill this grant, when the certificates of its land department have stood unchallenged for from 13 to 18 years, and when purchasers under these certificates have bought, improved, and paid taxes on these lands, is far inferior to the equities of such purchasers, and ought not to prevail against them.

The counsel for the government, however, argues that the purchasers who hold the legal title to these lands were not necessary parties to this suit; that the United States is entitled to a decree canceling the certificates as against the railroad company, under the provisions of the act of 1887, regardless of the rights of the subsequent purchasers; and that the relief given to these purchasers by the act, through applications to the land department, excludes them from all other rights and remedies. But there is nothing in the act of 1887 to support this contention. The rights and remedies these purchasers are pursuing in these suits existed in the absence of the act of 1887. There is nothing in that act that indicates any intention on the part of congress to deprive them of any defenses or rights they then had under the well-established rules of equity jurisprudence. On the other hand, that act grants them additional privileges, and proves that they are especial favorites of congress, as well as of courts of equity. Under the settled rules of practice in equity, the holders of the legal title to these lands were indispensable parties to a suit to annul that title; and the fact that the holders of that title were bona fide purchasers of it for value, without notice of its defects, was a perfect defense to this suit.

The third assignment of error to be considered is that the appel-

v.67 f.no.8—61

lees who hold this title as the direct or remote grantees of the rail-road company are not in fact bona fide purchasers. This presents a question of fact which the circuit court has decided against the appellant after a full consideration of the evidence. The finding of that court is presumptively correct, and unless an obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, it should be permitted to stand. Warren v. Burt, 7 C. C. A. 105, 110, 58 Fed. 101, and 12 U. S. App. 591; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355; Evans v. Bank, 141 U. S. 107, 11 Sup. Ct. 885; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821.

·  According to Mr. Pomeroy, "the essential elements which constitute a bona fide purchaser are therefore three: A valuable consideration, the absence of notice, and presence of good faith." 2 Pom. Eq. Jur. § 745.

On October 31, 1867, Barney and his associates were the owners of the stock of the Winona Railroad Company. On that day they sold their stock in the railroad company to the owners of the Chicago & Northwestern Railway Company, and at the same time bought of the Winona Company as many of its lands as should be received by it on account of the 105 miles of its railroad that had then been built. They took the agreement of the Winona Railroad Company to procure the certification of these lands from the United States, and to convey them to the parties to be designated by themselves, and they agreed to take in satisfaction of this contract all the lands that should be received by said company, commencing at its eastern terminus, and proceeding westerly until the full quantity was obtained. They paid the railroad company in full for these lands on that day, by satisfying a debt the company owed them for constructing the 105 miles of railroad, and for money they had loaned to it, and by assigning the stock of the railroad company to those in control of the Chicago & Northwestern Company. Here was a valuable consideration fully paid by Barney and his associates. The satisfaction and discharge of the indebtedness of the railroad company to them was in itself a sufficient and a valuable consideration for this purchase. Railroad Co. v. National Bank, 102 U. S. 14, 24. Between 1867 and 1876 the land department of the United States indicated and certified to the state all but 680 acres of these lands, and it certified the remaining 680 acres prior to 1880. The appellee the Winona & St. Peter Land Company was organized in 1876. Barney and his associates or their successors in interest under the contract of October 31, 1867, sold the lands covered by that contract which had not already been sold to purchasers from them to this land company for its capital stock, which aggregated $500,000. Here again was a sufficient and valuable consideration paid for these lands by the land company; and it is clear that the first essential element of a bona fide purchaser inhered in both the purchase of Barney and his associates in 1867, and in that of the land company in 1876. Did they purchase in the absence of notice of defects in the title? Before 1881 the railroad company had conveyed to the

parties entitled to them, under the contract of October 31, 1867, all the lands in controversy except 240 acres that had been certified to the Sioux City Company, and except the lands conveyed to the land company on November 20, 1887, in obedience to the decree of the court in Railroad Co. v. Barney. The decree in that case that these lands should be so conveyed was rendered in the circuit court in April, 1881. It was afterwards affirmed on appeal. But, so far as the question of notice to these purchasers is concerned, there was no change in the status of affairs from 1867 until after the decision of the supreme court in Railway Co. v. Dunmeyer, in 1884. When Barney and his associates purchased these lands, in 1867, only 320 acres of them had been certified to the state; and the evidence is plenary that none of these purchasers had any notice of any defects in the title to any of these lands. After 1867 they did not own the stock of the railroad company or control its operation. They paid for the lands in that year. They could not then have had any notice or knowledge that the secretary of the interior would subsequently indicate, and that the company would in 1872 and in subsequent years receive, lands to which it was not entitled under its grants. They and their successor in interest—the land company—were bound under their contract to take the lands received by the railroad company from the United States, and the railroad company was bound by its contract to apply for and to obtain the lands it had earned. But it was not the land company, nor was it Barney and his associates, that applied for and procured the certificates of these lands to the state in the years between 1870 and 1880. It was the railroad company, which had then passed beyond their control. There is no doubt that the railroad company applied for, and the officers of the land department certified, the lands here in question in the utmost good faith. They all believed that the railroad company was entitled to them. But, after all, it was their mistake, and not that of Barney and his associates, or that of the land company, that caused the railroad company to receive, and to vest in the land company, the title to these lands that the railroad company was not entitled to, instead of an equal number of acres within its indemnity limits which it should have received. The evidence in this record that neither the land company nor Barney nor any of his associates had any notice or knowledge of this mistake, or of any claim of the United States to any of these lands, until long after they had paid the full consideration for their respective purchases, is very persuasive. Indeed, the United States itself did not discover it until 1884,—eight years after the land company had fully paid for the lands. Up to that time the officers of the land department had uniformly held that the railroad company had earned and was entitled to these lands under the acts of congress. In Railroad Co. v. Whitney, 132 U. S. 357, 366, 10 Sup. Ct. 112, the supreme court said of the action of these officers in a similar case:

"It is true that the decisions of the land department on matters of law are not binding upon this court, in any sense. But on questions similar to the one involved in this case they are entitled to great respect at the hands of any court. In U. S. v. Moore, 95 U. S. 760, 763, this court said: 'The con-

struction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration, and ought not to be overruled without cogent reasons. * * * The officers concerned are usually able men and masters of the subject. Not unfrequently they are the drafts-men of the laws they are afterwards called upon to interpret.' See, also, Brown v. U. S., 113 U. S. 568, 571, 5 Sup. Ct. 648, and cases cited; U. S. v. Burlington & M. R. R. Co., 98 U. S. 334, 341; Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 418, 5 Sup. Ct. 208."

It is no wonder that purchasers of this title rested in fancied se-curity on a title sustained by decisions to which the supreme court pays such respect. The testimony of the witnesses and the cir-cumstances surrounding these transactions force us to the conclu-sion that the second essential element of a bona fide purchase—ab-sence of notice of defects in their title—was not absent from the purchase by Barney and his associates, nor from the purchase by the land company. Nor was the element of good faith lacking. There is no evidence of any fraud or of any conspiracy, or of any attempt on the part of any of the parties connected with this transaction to obtain for the railroad company or for themselves any lands to which they were not justly entitled. The officers of the railroad company supposed that that company had earned and was entitled to the lands it applied for and received; the officers of the land department, to whom the government had intrusted the duty of de-ciding the question, so held; and Barney and his associates and the land company accepted the title to the lands in good faith, in satis-faction of the executory contract to convey them, for which they had fully paid as early as 1876. They or their grantees or ap-pointees under the contract of 1867 were clothed with the legal title to all these lands years before the United States made any claim to recover them. It goes without saying that those who hold any of these lands under deeds, contracts, or designations made by Barney and his associates or the land company are as fully protected as they are, and we think the character of bona fide purchasers ought not to be denied to any of them.

A single question remains for consideration. Were the lands within the place limits of the grants to the Winona Company, and within the indemnity limits of the grants to the Sioux City Com-pany, upon which homestead entries and pre-emption filings, that were subsequently canceled by the proper officers of the land de-partment, existed at the time of the definite location of the line of the railroad of the Winona Company, rightfully certified to the state for the Sioux City Company by the officers of the land de-partment?

Section 1 of the act of March 3, 1857, grants to the territory of Minnesota, for the purpose of aiding in the construction of the railroads of these two companies:

"Every alternate section of land, designated by odd numbers, for six sec-tions in width on each side of each of said roads and branches; but in case it shall appear that the United States have, when the lines or routes of said roads and branches are definitely fixed, sold any sections, or any parts there-of, granted as aforesaid, or that the right of preemption has attached to the same, then it shall be lawful for any agent, or agents, to be appointed by the governor of said territory or future state to select, subject to the approval of

the secretary of the interior, from the lands of the United States nearest to the tiers of sections above specified, so much land in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or otherwise appropriated, or to which the rights of preemption have attached, as aforesaid: * * * provided, that the land to be so located shall, in no case, be further than fifteen miles from the lines of said roads or branches: * * * and provided further, that any and all lands heretofore reserved to the United States, by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever, be and the same are hereby reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads and branches through said reserved lands, in which case the right of way only shall be granted, subject to the approval of the president of the United States."

Section 2 of that act provides:

"That the sections and parts of sections of land which by such grant shall remain to the United States, within six miles on each side of said roads and branches, shall not be sold for less than double the minimum price of the public lands when sold; nor shall any of said lands become subject to private entry until the same shall have been first offered at public sale at the increased price." 11 Stat. p. 195, c. 99.

Section 7 of the act of May 12, 1864, grants to the state of Minnesota, for the purpose of aiding the construction of the railroad of the Sioux City Company, 4 additional alternate sections of land per mile, to be located within 20 miles of the line of its road, and to be selected upon the same conditions, restrictions, and limitations as are contained in the act of March 3, 1857. Section 1 contains the same proviso that we have just quoted from section 1 of the act of 1857, relating to the reservation from the operation of the act of lands theretofore reserved by the United States to aid in any object of internal improvement or for any other purpose; and section 2 of that act contains the same provision as section 2 of the act of 1857, increasing the price of the land remaining within the place limits of the grant to double the minimum price. 13 Stat. 72.

It is contended that the proviso in section 1 of the act of March 3, 1857, and in section 1 of the act of May 12, 1864, which treats of lands reserved for internal improvement and for other purposes, expressly reserved the lands within the place limits of the Winona Railroad Company, subject to homestead entries and pre-emption filings, not only from the grant to that company, but from the entire operation of these acts. The argument is (1) that these lands were excepted from the grant to that company by the earlier provisions of section 1 of the act of 1857, and that they were thereby reserved to the United States within the meaning of this proviso, for homesteads and pre-emptions; and (2) that by section 2 of the act of 1857 their price was increased to double the minimum price, and thereby they were reserved to the United States for sale. The argument is specious, but we think it is unsound. The proviso which closes section 1 has no reference whatever to lands "sold and to which preemption rights have attached." Those lands had been excepted from the granted lands, and their treatment had been concluded in the earlier part of the section. They were treated as the property of the purchasers and of the pre-emptors, and not as the property of the United States, and they were excepted from the

granted lands because in equity they were no longer its property. The proviso treated, not of these lands, but of lands reserved to the United States by acts of congress for its works of internal improvement, for its military purposes, for sale, or for any other like purpose. This is made clear by the latter clause of the proviso, which grants the necessary right of way over these lands to the respective railroad companies, subject to the approval of the president. It was not over lands sold or to which pre-emption rights had attached that congress intended to grant this right of way, but over lands of the United States upon which other parties had no claims as purchasers or pre-emptors. The same considerations lead irresistibly to the conclusion that the provisions in section 2, increasing the price of the sections remaining to the United States within the place limits of the grant, have no application to the odd sections subject to homestead entries and pre-emption filings. This section provides that the price of the lands it refers to shall be 'double the minimum price, and that none of them shall be subject to private entry until they have been offered for sale at the increased price. Congress certainly did not intend to increase the price of lands sold or claimed by pre-emptors, or to prevent their entry until they were offered for sale at double the minimum price. They were not legislating concerning these lands. They were dealing with sole reference to the even-numbered sections within the place limits of the grant, the sections which the United States had reserved to itself for sale; and this section has no reference to any other lands. For the same reasons the provisions of sections 1 and 2 of the act of 1864 have no application to the lands in controversy. U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 367, 370, 371, 12 Sup. Ct. 13.

The question recurs, were these lands excepted from selection as indemnity lands by the Sioux City Company by that portion of section 1 of the act of 1857 preceding the proviso we have considered? There is a wide difference in legal effect between the grant of lands in place and the grant of the right to select and receive lands in lieu of those in place which are sold or otherwise appropriated at the time the line of the railroad is fixed. Until the line of the railroad is definitely fixed, the former is in the nature of a float; but, the instant the railroad company files with the secretary of the interior its map of the definite location of its line, the lands within the primary or place limits are thereby identified and segregated from the public domain, and the grant of those lands takes effect as of the day of the date of the act of congress which bestows it. Smith v. Railroad Co., 7 C. C. A. 397, 406, 58 Fed. 513; Railroad Co. v. Baldwin, 103 U. S. 426; Grinnell v. Railroad Co., Id. 739; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389; Land Co. v. Griffey, 143 U. S. 32, 12 Sup. Ct. 362. Moreover, since the lands within the place limits are identified by the definite location of the line, no lands within those limits that are not then subject to the grant become or ever can become a part of it. Lands sold

or appropriated and lands to which pre-emption rights have at that time attached are excluded from these granted lands as completely as though they were excepted in a deed. Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566; Burr v. Greeley, 3 C. C. A. 357, 52 Fed. 926, and 10 U. S. App. 409.

But these rules have no application to the right to select lands without the place limits in lieu of those excepted from the grant of lands within them. The act of 1857 provides that if it shall appear that any of the lands within the primary limits have been sold by the United States or otherwise appropriated, or that pre-emption rights have attached to any of them when the line of the railroad is definitely fixed, any agent appointed by the governor of the state may select, from the lands of the United States, subject to the approval of the secretary of the interior, an equal quantity of lands within the indemnity limits of the grant. Ordinarily, it will not "appear" at the time the line of the road is definitely fixed how many acres of land or what lands are excepted from the grant of lands in place by sales, appropriations, or the rights of pre-emptors. When the grant is extensive, and especially when, at the time of the definite location of the line, the region through which it extends is a well-settled agricultural country, crossed by conflicting land grants, many years may be required to ascertain what and how many lands are thus excepted from the primary grant. When this has been discovered, time will be required to make the selections. The history of the grants under consideration furnishes a striking illustration of these facts. During all this time the grant of the indemnity lands is in the nature of a float. The right to select these lien lands cannot be exercised until the deficiency of the lands granted appears. The selection may then be made from any of the lands of the United States within the indemnity limits of the grant, and, when such a selection is made and approved, the grant for the first time attaches to any specific lands within those limits. Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 421, 5 Sup. Ct. 208; Barney v. Railroad Co., 117 U. S. 228, 232, 6 Sup. Ct. 654; Sioux City & St. P. R. Co. v. Chicago, M. & St. P. Ry. Co., 117 U. S. 406, 408, 6 Sup. Ct. 790; Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496, 511, 10 Sup. Ct. 341; U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 371, 12 Sup. Ct. 13.

The grant of lands for the Sioux City Company then attached to specific lands within its place limits when the line of its railroad was definitely located opposite to them, but the grant of indemnity lands first attached to specific lands when they were selected and their selection was approved by the secretary of the interior. Accordingly, the lands subject to the grant within the place limits were those that were public lands when the line of the road was definitely fixed,—the lands that were not then sold, otherwise appropriated, or subject to pre-emption rights; and the lands subject to the grant within the indemnity limits were those that were public lands when they were selected and their selection was approved,—the lands that at that time were not sold, otherwise appropriated, or subject to pre-emption rights. Ryan v. Railroad Co., 99 U. S. 382; Railroad Co. v. Herring, 110 U. S. 27, 38, 39, 3 Sup. Ct. 485; St. Paul & S. C. R. Co. v.

Winona & St. P. R. Co., 112 U. S. 720, 730, 731, 5 Sup. Ct. 334; Sioux City & St. P. R. Co. v. Chicago, M. & St. P. Ry. Co., 117 U. S. 406, 6 Sup. Ct. 790; Wisconsin Cent. R. Co. v. Price Co., 133 U. S. 496, 513, 10 Sup. Ct. 341. In Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 5 Sup. Ct. 208, lands which were within the indemnity limits of a grant to the state of Kansas for the Atchison, Topeka & Santa Fé Railroad Company, under the act of March 3, 1863 (12 Stat. 772), were subsequently, and before they were selected by the Atchison Company, granted as lands in place to the predecessor of the Kansas Pacific Railroad Company by the act of July 2, 1864 (13 Stat. 356). The supreme court held that these lands were thereby withdrawn from the public lands subject to selection by the Atchison Company; that, as they were not lands of the United States at the time it attempted to make its selection, it was immaterial that they had been such when the act was passed which made the grant. On the other hand, in Ryan v. Railroad Co. 99 U. S. 382, 388, a tract of land in the indemnity limits of the grant to the California & Oregon Railroad Company under the act of July 25, 1866 (14 Stat. 239), was, at the date of the act and at the time of the definite location of the line of the railroad, subject to a claim for a Mexican grant sub judice. If this tract had been within the place limits of the grant to the railroad company, it would certainly have been excepted from it. On March 3, 1873, the claim for the Mexican grant was finally rejected. On March 30, 1874, the successor in interest of the California & Oregon Railroad Company selected this tract as a part of its indemnity lands and obtained a patent for it. The supreme court held that the tract became a part of the public lands of the United States when the claim under the Mexican grant was finally rejected; that it was therefore public land when the selection was made; that it was immaterial that it had been subject to the Mexican grant when the act was passed; and that it was lawfully selected and rightfully patented. The same effect must be given to the selection and certification of these indemnity lands to the Sioux City Company. It was immaterial that there were homestead entries and pre-emption filings upon them when the act of 1857 was passed, or when the line of the railroad was definitely fixed. When these homestead entries and pre-emption filings had been duly canceled, the lands became a part of the public domain of the United States, subject to selection by and certification to that company under its grants, and the lands were rightly certified to the state for the benefit of that company.

Finally, it is insisted that inasmuch as in a case between the Winona Company and the Sioux City Company (St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 720, 5 Sup. Ct. 334), in which the questions we have been considering were not presented, a decree was made and executed which transferred these lands to the Winona Company, when the Sioux City Company should have been permitted to retain them, the Winona Company cannot in this action avail itself of the fact that they were properly certified to the Sioux City Company. The conclusive answer to this contention is that this suit is based on the act of 1887. That act authorizes suits to cancel

patents, certificates, or other evidences of title to lands "erroneously certified or patented," and "to restore the title thereof to the United States." 24 Stat. 556. These lands were not erroneously certified or patented. The United States is not entitled to a restoration of the title, and it cannot maintain a suit in equity to review the decision of a question of title between private parties which is res adjudicata between them, and in which it has no interest.

The decree below must be affirmed, without costs to either party in this court; and it is so ordered.