## FELIX *et al. v.* PATRICK *et al.*

*(Circuit Court, D. Nebraska.* October 29, 1888.)

1. EQUITY—LACHES.

Some half-breed scrip for government land, a blank power of attorney for its location and conveyance, and a blank quitclaim deed, were obtained from the owner by fraud, and came into the hands of defendant, who used the scrip to obtain a patent to land of which he was in possession. The patent was taken in the name of the owner of the scrip, which was not transferable, and the blank instruments were filled out, conveying the land to defendant. At that time the land was only of nominal value, but it afterwards became very valuable. *Held* that, the acts of defendant being in violation of the original owner's rights, there was no express relation of trust, and that the owner and her heirs, having contributed nothing to increase the value of the land, and having delayed to bring the action to declare the defendant trustee and to cancel the conveyances till after the period of limitation, were precluded by their laches.

2. LIMITATION OF ACTIONS—EXCEPTIONS—INDIANS.

Under the Nebraska bill of rights, § 13, providing that all courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy, and under Rev. St. U. S. § 2126, relating to actions between an Indian and a white man, about a right of property, an Indian may come into the courts and litigate his title to land, and, where he is not shown to be uneducated or unfamiliar with the laws, the statute of limitations will run against him.

In Equity.

Bill by Pierre Felix and others, heirs of Sophia Felix, against Matthewson T. Patrick and others, to declare defendants trustees of certain land.

*J. H. Parsons*, for Pierre Felix.

*J. C. Cowin, Shipman, Barlow, Larocque & Choate*, for Chas. Ogden.

*J. L. Webster, Ambrose Cavanagh, Crane & Atwell,* and *Geo. E. Pritchett,* for defendants.

BREWER, J. This case is submitted on demurrer to the bill. The facts, as alleged, are these: In 1854 one Sophia Felix was a half-breed Sioux Indian, residing near Mendota, in Minnesota. Under and by virtue of the treaty with the Sioux Indians of date July 15, 1830, and proclaimed February 1, 1831, and an act of congress approved July 17, 1854, said Sophia Felix was entitled to receive from the government scrip for the location of 480 acres. In 1857 this scrip was issued to her in separate parcels. The act provided that no transfer or conveyance of the scrip should be valid. Afterwards said Sophia Felix intermarried with one David Garnelle. On the 31st of March, 1860, some persons unknown, by fraudulent practices, obtained from her and her husband a portion of this scrip, good for a hundred and twenty acres, also a blank power of attorney, duly acknowledged, for the location of said scrip, and for the conveyance of the land after location; also a blank quitclaim deed, duly acknowledged. In these instruments the name of the attorney, the description of the land, and the name of the grantee were blank. In November, 1861, the defendant, Mathewson T. Patrick, obtained possession of this scrip and these blank instruments from some unknown persons. Prior to that time said Patrick had been in possession of the premises now in controversy, seeking to acquire title thereto by pre-emption, but had been unsuccessful, the land being within the corporate limits of the town of Omaha. After obtaining possession of this scrip, Patrick used it to enter the land, and July 3, 1863, the patent was issued in the name of Sophia Felix. The blanks in the instruments were filled with the name of an attorney, a description of the land, and the name of Patrick as grantee; and the attorney thus named in the power of attorney executed another deed in the name of Sophia Garnelle and her husband to him. These instruments were all placed of record. Patrick knew at the time of these transactions—indeed, was charged by law with knowledge of the fact—that the scrip was inalienable, and therefore was still the property of Sophia Felix, yet he used it for the purpose of securing title to the land to himself, and did not pretend and was not attempting to act as her agent. On July 25, 1868, congress passed an act confirming the title to certain lands in the city of Omaha which had been entered with Indian or half-breed scrip. The land in question was, however, in express terms exempted from the operation of this act. Afterwards, on February 2, 1869, another act was passed touching this land, which reads as follows:

"An act supplementary to an act entitled 'An act to confirm the titles to certain lands in the state of Nebraska:' Be it enacted by the senate and

house of representatives of the United States of America, in congress assembled, that the provisions and benefits of an act entitled ' An act to confirm the title to certain lands in the state of Nebraska, approved the 25th day of July, Anno Domini eighteen hundred and sixty-eight, be, and the same are hereby, extended to the east half and north-west quarter of the south-east quarter of section nine, township fifteen, range thirteen east, Sixth principal meridian, in Douglas county, Nebraska, and that the title of the same is hereby confirmed to the parties holding by deed from the patentee.'" 15 U. S. St. at Large, 269.

The tract lies, as heretofore stated, within the limits of the city of Omaha; has been platted into lots and blocks, and large numbers of lots sold to individuals, many of whom are joined as parties defendant. It has become of immense value; worth, as stated by counsel, from a million to a million and a half dollars. Sophia Felix Garnelle died on the 25th day of December, 1865, without children and intestate. Her husband, David Garnelle, died in 1882. Her mother died before her, and her father died October 22, 1876. The present plaintiffs are her brothers and sister and her sole heirs. Neither she nor her husband nor father nor these plaintiffs knew what had become of the scrip, or that it has been entered for this land, until the year 1887. The present plaintiffs became citizens of the United States for the first time on August 29, 1887, having then severed their tribal relations with the Sioux Indians. This bill was filed in the present year, and seeks to charge the defendants as trustees for the benefit of plaintiffs, and asks that the power of attorney and the two deeds be canceled as clouds upon their title, and the act of congress of February 2, 1869, in so far as it attempted to vest title in Patrick, be declared unconstitutional and void, and also that possession be delivered to them.

Several grounds of demurrer were urged and argued by counsel with great earnestness and ability before my Brother DUNDY and myself. The two principal ones are as to the effect of the act of congress of February 2, 1869, and the staleness of plaintiffs' claim. It will be noticed that the act of congress confirms the title "to the parties holding by deed from the patentee." Now, if the land, by reason of its location within corporate limits was not subject to pre-emption or private entry, as seems probable, (section 2258, Rev. St. U. S.; *Root* v. *Shields*, Woolw. 340; *Eldred* v. *Sexton*, 19 Wall. 189,) it may be that the patent in 1863 was improperly issued, and that the equitable title still remained in the United States; and a plausible argument is made that congress by this act of 1869 vested the title which still equitably remained in the government in Patrick, as an apparent, at least, grantee of the patentee. But I do not care to discuss this question, for to my mind the other defense is satisfactory and clear. Prior to 1861, Patrick had been in possession of these lands, seeking to acquire title from the government. In that year he obtained possession of this scrip, and in 1863 acquired the patent. Twenty-eight years after Sophia Felix had parted with her scrip, 27 years after defendant had obtained and used the scrip, 25 years after the patent had been issued, and when the lands, with the growth of the city of Omaha, had risen in value from a mere nominal sum to over a million

of dollars, these plaintiffs, who had done nothing to assist in the development and growth of the city, done nothing towards bringing about the increased value of the land, ask that this enormous property be given to them on the ground that their ancestor was defrauded of the scrip which originally paid for it. If an action at law had been instituted, the statute of limitations would long since have been a bar. Why should not equity follow the law and protect these defendants against this ancient claim? It is insisted that defendants are trustees and that plaintiffs are the *cestuis que trust*, and that no statute of limitations runs against the enforcement of a trust until at least the repudiation of the trust is known. This may be true in case of an express trust, but clearly there was none such here. An express trust implies a fiduciary relation consciously and intentionally entered into by some contract or agreement between the parties. But Patrick never intended to act or pretended to act as the mere agent of Sophia Felix. What he did, even if wrongful, and in violation of her rights, was done from the first for himself, and in his own behalf. The averments in the bill show that he never took this scrip intending to act as her agent, but that he took it wrongfully, and in violation of her rights. It is not even alleged that she parted with this scrip to an agent, but the averment is that it was by some fraudulent practices obtained from her. Defendant had no part in these fraudulent practices. It was through no wrong or fault of his that she was induced to part with it. Knowing, as we do, how land scrip passed in the market, the only fair understanding of the facts as disclosed by the bill is that this scrip was wrongfully obtained from Sophia Felix, and placed on the market, and that defendant seeking scrip wherewith to enter this land found and purchased this. He took it to use for himself, and not for her, so that none of the elements of an express trust enter into the transaction. Whether by reason of his knowledge of the fact that the scrip was inalienable, and therefore still the property of Sophia Felix, a constructive trust arose, it is scarcely necessary to determine. There are some authorities which would seem to deny the existence of any trust under the circumstances as disclosed. Thus, in 1 Perry, Trusts, 144, it is said: "But if one who stands in no fiduciary relation to another appropriates the other's money, and invests it in real estate or other property, no trust results to the owner of the money." Also, see *Hawthorne* v. *Brown*, 3 Sneed, 463; *Ensley* v. *Balentine*, 4 Humph. 233; *Doyle* v. *Murphy*, 22 Ill. 502; *Steele* v. *Clark*, 77 Ill. 471; *Weer* v. *Gand*, 88 Ill. 490; *Garvey* v. *Jarvis*, 46 N. Y. 310; *Dixon* v. *Caldwell*, 15 Ohio St. 412; *Campbell* v. *Drake*, 4 Ired. Eq. 94. Still it must be conceded that other authorities tend in the opposite direction, and would hold this to have been a constructive trust. But in such cases equity will recognize the defense of laches and staleness of claim, under proper circumstances, and this is a case where it seems eminently proper to recognize and enforce such a defense. Under ordinary circumstances it does not seem probable that any one would seriously contend that a claim so stale could be enforced, or that equity would take property which had increased so enormously in value after this lapse of time, and give it to parties who had done

nothing towards such enhancement of value. But it is earnestly contended that a different rule should be applied in this case, because plaintiffs and their ancestors were Indians; that the law is very tender in respect to the rights of such persons, who are not familiar with our laws and methods of transacting governmental or private business, and were ignorant of the disposition which had been made of the scrip. And it is also urged that as Indians they were the wards of the government, and could not have asserted their rights to the property, even if they had known what their rights were. It is not shown that they were not persons of education and intelligence, or that they were not in fact familiar with the land laws, and the methods of governmental business, or that they were not in fact as competent to look after their rights as any persons. We all know that many of these Indians, especially the half-breeds, are well educated, intelligent, and as fully competent to look after their business affairs as any persons; and the fact that they were Indians, and maintaining tribal relations, and were in a certain sense the wards of the government, did not debar them from a hearing in the courts of Nebraska. The thirteenth section of the bill of rights of this state reads as follows:

"Sec. 13. All courts shall be open, and every person, for any injury done him in his lands, goods, person, or reputation, shall have a remedy by due course of law and justice, administered without denial or delay."

"Every person," is its language; so that the doors of the courts of this state were open to these plaintiffs as well as to any other person who had or thought he had any claims to property within this state. As a matter of fact Indians are frequent suitors in the courts of the various states. I recall three cases in the supreme court of my own state, Kansas, and have no doubt there were many more. In *Swartzel* v. *Rogers*, 3 Kan. 374, a suit to establish title to a half interest in certain lands, and for partition, was maintained by an Indian. In *Blue Jacket* v. *Johnson Co.*, Id. 299, an action was maintained by one of the chiefs of the Shawnee nation to restrain the taxation of his lands, and in *Wiley* v. *Keokuk*, 6 Kan. 94, an action for false imprisonment was also maintained by an Indian. The second of these cases was taken to the supreme court of the United States. *The Kansas Indians*, 5 Wall. 737. While the judgment of the supreme court of Kansas was reversed, the right of the Indian to sue in the courts of the state was not questioned. Indeed, it was impliedly recognized, for the court say:

"It is argued because the Indians seek the courts of Kansas for the preservation of rights and the redress of wrongs, sometimes voluntarily, and in certain specified cases by direction of the secretary of the interior, that they submit themselves to all laws of the state."

Further, the Revised Statutes, in section 2126, carries the same implication. It reads:

"In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership."

At any time during the last 27 years these plaintiffs or their ancestors could have come into the courts of Nebraska and asserted their rights, and, as this scrip was of value simply for the entering of lands, they could at any time, by examining the records at Washington, have ascertained whether it had been used and by whom, and where the land for which it had been used was located. The means of knowledge were open before them. They had the right to sue, and the courts would have given them full protection. It would savor little of equity to permit them to come in now and take from these many defendants, most of whom are innocent of any intentional wrong, property of such enormous value, on the ground that their ancestor 28 years ago was swindled out of scrip of such trifling value,—a million dollars to-day for one hundred and fifty dollars 28 years ago. I cannot believe that equity demands or even tolerates this. The demurrer will be sustained.