## JOHNSON et al. v. PACIFIC COAST S. S. CO.

(First Division. Juneau. July 9, 1904.)

No: 159a.

1. PUBLIC LANDS—CANCELLATION OF PATENT.

When a patent has once issued for public lands of the United States, the duties of the Interior Department have been fully performed, and it cannot lawfully further consider the rights of contesting parties to such land. The department has no power to set aside or cancel the patent.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 312.]

2. SAME—FRAUD—MISTAKE—RIGHT OF ACTION.

Where a patent to public lands has been issued to the wrong person, an action in a court of competent jurisdiction will lie to remedy the wrong.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, §§ 332, 336, 339.]

3. INDIANS—CIVIL RIGHTS—ACTIONS.

The Indians of Alaska may come into the courts on equal terms with citizens, and maintain whatever rights the laws vest in them.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indians, § 18.]

4. SAME—POSSESSORY RIGHTS ON PUBLIC LANDS.

Section 8 of the act of Congress of May 17, 1884 (23 Stat. 24, c. 53), for the protection of the property rights of the Indians of Alaska, *held* to extend to the lands claimed and occupied by them collectively in their villages and such other places as were occupied by them for fishing, hunting, and other like purposes.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indians, § 28.]

5. PUBLIC LANDS—INDIANS—TOWN SITES.

Indians, natives of Alaska, though living in villages, *held* not to be entitled to claim village sites, under section 11 of the town site act of March 3, 1891 (26 Stat. 1099, c. 561 [U. S. Comp. St. 1901, p. 1467]).

6. INDIANS—CIVIL RIGHTS—PUBLIC LANDS—TRUSTS.

The evident purpose of Congress in its legislation in relation to the property rights of Indians in Alaska was to protect the natives in the possession of lands continuously claimed and occupied by them, but up to this time Congress has not fixed the terms under which they might acquire title thereto. It is evident, therefore, that the complainants in this action cannot have so much of the relief prayed for as would declare that the defendants were holding the lands in trust for their benefit, or require them to convey to the several complainants.

[Ed. Note.—For cases in point, see vol. 27, Cent. Dig. Indians, § 28.]

7. PUBLIC LANDS—LANDS OPEN TO ENTRY—INDIAN LANDS.

Lands occupied and used exclusively by Indians at the time of the passage of the act of May 17, 1884 (23 Stat. 24, c. 53), could not be disposed of by the Interior Department to persons other than the native occupants, and a patent issued to such other persons would be without authority of law and void.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 46.]

8. SAME—EVIDENCE—INDIANS.

To authorize a court of equity to set aside a patent issued by the Interior Department of the government on the ground of prior occupancy and possession by natives of Alaska, there should be the clearest and strongest proof of occupancy by the natives on or before May 17, 1884, and continuously down to the time of the patent.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 335.]

2 A.R.—15

9. NUMBER OF LOTS—TOWN SITES.

    Persons occupying a reasonable quantity of public land in Alaska for manufacturing, business, houses, or for a wharf may obtain title to such land under the acts of Congress providing therefor. Such applicants are not necessarily restricted to a single lot, the size of which may be fixed by an arbitrary rule of the trustee.

This action is brought in the equity side of the court for the purpose of having certain deeds made by the trustee of the town site of Juneau to Waterbury and Cooledge set aside, on the ground that the same were fraudulently obtained by said parties, and the conveyances made by said Waterbury and Cooledge to the defendant, the Pacific Coast Steamship Company, a corporation, in pursuance to the same fraudulent purpose.

It is alleged in the bill of complaint that plaintiffs are native Alaska Indians. That the plaintiffs and those from whom they claim have been in actual occupancy and have improved and built their homes upon that certain tract or parcel of land situated on the shore of Gastineau Channel known and designated as blocks R, S, and T on the official plat of the town site of Juneau, Alaska, together with the beach abutting thereon, since prior to the 17th day of May, 1884, and since about the year 1881, and are now and have been continuously in possession thereof as their homes since the said year of 1881. That the possession of said premises by plaintiffs since the year 1881 has been open, notorious, and adverse to all the world, and the right to the same was confirmed to them by act of Congress of May 17, 1884. It is further alleged that the town site of Juneau was surveyed as a town site under and pursuant to the provisions of the act of Congress of March 3, 1891. That said town site as originally surveyed upon the ground did not include the premises nor the exterior boundaries of the town site as was surveyed upon the ground. That on or about the 13th day of October, 1893, pursuant to

an application for the entry of said town site of Juneau under the act of March 3, 1891, an entry was allowed thereon, which said town site as entered included within its exterior boundaries the property of the plaintiffs above described, all of which was unknown to plaintiffs, and by the use of ordinary diligence on their part could not have been known until said month of September, 1898. That the patent to said town site was issued in the year 1897, and nothing was done prior to said year towards issuing deeds to the inhabitants of said town. In the early part of the year 1898, the defendant, intending to cheat, defraud, and swindle plaintiffs out of their property, and while knowing it had no right to the same, procured one Waterbury and Cooledge to file their applications with the trustee of the town site of Juneau for the said property, and procured said Waterbury and Cooledge to state in their said applications that they were occupants of said land at the date of said town site entry, and were entitled to a deed of the same under and pursuant to the said town site act aforesaid; all of which statements were false and fraudulent. That in truth and in fact neither said Waterbury nor Cooledge were ever in the District of Alaska, nor occupied or claimed said ground. That said ground has never been occupied or claimed or possessed by any other person or persons other than the plaintiffs. That the said application for a deed from said trustee to the ground was unknown to plaintiffs, and by the use of ordinary diligence could not have been known to them prior to said date, for the reason that the plaintiffs are ignorant natives, unable to read or write, and no notice of the fact that the trustee of the town site of Juneau was about to issue deeds to the occupants of said town was ever served upon them, and they had no notice or knowledge that the said property was within the exterior boundaries of the town of Juneau as patented. That the defendant procured the trustee on March 21, 1898, upon an ex parte hearing of said appli-

cation on the part of Waterbury and Cooledge, to issue a deed purporting to convey to them said property. That afterwards, on April 1, 1898, pursuant to the purpose of the defendant to cheat, swindle, and defraud plaintiffs and procure a title to their said property, the said Waterbury and Cooledge executed a deed purporting to convey the property to the defendant, and plaintiffs charge that all the steps taken by said Waterbury and Cooledge procuring said deed from said trustee were taken and made under the direction of the defendant, and pursuant to the fraudulent action aforesaid.

It is further alleged that the deed by the town site trustee is void, issued without jurisdiction on his part, and contrary to the provisions and prohibitions of section 14 of the act of March 3, 1891 (26 Stat. 1100, c. 561 [U. S. Comp. St. 1901, p. 1468]).

It is further alleged that the several conveyances and the claim of the defendant asserted thereunder has cast a cloud upon the plaintiffs' title. Plaintiffs pray for the usual process of the court, and that upon hearing thereof the conveyances aforesaid be canceled, set aside, and held for naught, and that defendant be decreed to hold the legal title in trust for the use and benefit of plaintiffs, and it be decreed to convey to plaintiffs the same; that plaintiffs be quieted to the title and in possession of said premises against the defendant, and for such other and further relief as in equity and good conscience they may show themselves entitled to.

The defendant's answer to plaintiffs' amended complaint admits that the defendant is a corporation, but denies specifically and at great length the important or material allegations of the complaint. As an affirmative defense, it is alleged in the answer that the plaintiffs have no legal capacity to sue, in that plaintiffs are not joint owners or occupants of, in, or to said blocks R, S, and T mentioned in plaintiffs' complaint, but claim in severalty certain and distinct parts thereof, and

that said plaintiffs do not claim to be joint owners or joint tenants in and to said premises. It is further alleged in said answer that plaintiffs on or about the ———— day of ————, 1898, filed their application with the trustee of the town site of Juneau, Alaska, to set aside the deed theretofore issued to John I. Waterbury and T. Jefferson Cooledge for said premises, to wit, blocks R, S, and T in said town of Juneau, and asking that the deeds be issued to them. That thereafter such proceedings were had that on the 10th day of November, 1898, the said trustee for the said town of Juneau, one Thomas R. Lyons, after full and complete hearing, denied said application and petition of the said plaintiffs. That thereafter, plaintiffs, feeling themselves aggrieved by the decision of the said town site trustee, took the case up for review to the United States Land Department at Washington, and such further proceedings were had that on, to wit, the 19th day of July, 1901, the Honorable Secretary of the Interior of the United States sustained the decision of the said trustee of the town site of Juneau, and denied the application of the plaintiffs herein. That the matter in controversy between said plaintiffs and this defendant before the said town site trustee, and which matter was appealed and taken up for review before the Secretary of the Interior, was and is the identical property and subject in controversy herein, and between the same parties, and that the findings and decision of the said United States Land Department are res judicata and binding on this court, and plaintiffs are estopped from further litigating the same matter and question in this court.

It is further alleged in said answer that on the 6th day of March, 1881, its grantor, M. W. Murry, being a citizen of the United States over the age of 21 years, and a resident of the District of Alaska, entered upon, located, and claimed, and entered into the actual possession of, that certain piece or parcel of land, the same being then public lands, unappropriated,

vacant, and not claimed by any person whatsoever, and the same being free and open to appropriation, did locate a wharf site, being 600 feet square, as is more fully set out in the location certificate thereof, recorded in Book 1 of Lode Claims, on page 144 of the records of the Harris Mining District, District of Alaska, and now embraced in the Juneau Recording District, and situated in the eastern end of the town of Juneau, Alaska, as then surveyed and platted by G. C. Hanus, and which town was formerly known as Rockwell, but now Juneau, Alaska, and that ever since the 6th day of March, 1881, the Pacific Coast Company and its said grantors have been in the continuous occupancy and undisturbed possession of the same, and are now entitled to the possession of the same, and that said blocks R, S, and T are included within the exterior boundaries of the town site of Juneau. That at the time of the said location of said wharf site the locator of the said property, one of the grantors of said defendant, marked the boundary thereof, and caused a survey thereof to be made. That in the year 1881, and before the location of said wharf site, the citizens of the said town of Juneau caused a survey of said town to be made by said Hanus, who surveyed not only the exterior boundaries thereof, but subdivided the same into lots and blocks, and which survey was by said citizens of said town, in a public meeting assembled for that purpose, accepted and adopted as the survey of the town formerly known as Rockwell, but now known as Juneau, Alaska.

That thereafter, on the 26th day of March, 1881, the said citizens of Juneau, Alaska, again met in public assembly, and approved of and ratified the action of the said M. W. Murry in making the said location of said wharf site, as aforesaid. That said premises, pretended to be owned by the plaintiffs herein, are embraced in and are a part of the lands and premises located by the said Murry, the grantor of the defendant, and that immediately after the location of said

wharf site, in the spring of 1881, said Murry and one James Carroll commenced thereon the construction of a wharf or dock, and continued the construction with diligence until the completion thereof, expending in such construction an amount aggregating upwards of $20,000.

That thereafter, during the continued possession and occupation of said premises by the defendant and its grantors, and while the defendant and its grantors were in actual possession of said wharf site, including the property in controversy, and entitled to the possession of the same, and claiming the same upon due application made to the town site trustee of the town of Juneau, after due and legal hearing thereon, said property was duly conveyed by said town site trustee to John I. Waterbury and T. Jefferson Cooledge, the grantees of the said M. W. Murry, and the grantors of the defendant; and that thereafter by proper deed of conveyance the said John I. Waterbury and T. Jefferson Cooledge, for valuable consideration, on or about the 12th day of April, 1898, duly conveyed to this defendant the said wharf site, including the property in controversy; and this defendant thereby, for valuable consideration, and without notice of the claim of the plaintiffs, or any of them, purchased the said property in good faith from the said John I. Waterbury and the said T. Jefferson Cooledge, and are now the owners in fee simple under the said deed issued by the town site trustee of the said town of Juneau.

The plaintiffs by reply practically deny all matters inconsistent or contradictory of the allegations of their complaint, admit that they filed the application mentioned in the second paragraph of the defendant's answer, but they say that the said application was dismissed by the Land Department and its officers. That they had no jurisdiction to recall the deed to Waterbury and Cooledge, and that plaintiffs' remedy was a suit in equity to cancel said deed, or have the defendant de-

. clared a trustee for them. That the matters and things passed upon and adjudicated by the Land Department in the proceedings mentioned in said answer are not the matters and things to be litigated herein.

Plaintiffs deny all and singular the allegations contained in' the third paragraph of said answer, except that they admit the construction of the wharf therein mentioned, but they say that said wharf was not upon the land in controversy herein, or any part thereof. Admit that the town site trustee issued a deed to Waterbury and Cooledge, and again allege that the said deed was obtained by fraud, as particularly set forth in plaintiffs' complaint.

From the record and evidence in this case it appears that on the 26th day of October, 1897, the trustee for the town site of Juneau published notice, as required by law, and his instructions requiring all parties having any interest in the lands within the town site of Juneau to file their application for such lands on the 15th day of November, 1897, or as soon thereafter as the trustee could receive the same. On March·21, 1898, John I. Waterbury and T. Jefferson Cooledge, Jr., filed their applications with the trustee of the town site of Juneau for the property in controversy, together with their abstract of ·title for the same, which abstract of title was taken from the records of the Juneau Recording District, and was duly certified by the United States Commissioner. At that time there were no other applications for said property, and the trustee's deed was duly executed for said above-described parcels of land to John I. Waterbury and T. Jefferson Cooledge. On the 1st day of October, 1898, W. E. Crews filed before the trustee a motion in the following words:

. "Comes now W. E. Crews, attorney for said petitioners, and moves the above-entitled trustee to order a hearing in the above-entitled matter to enable said petitioners to show cause why a hearing should be granted them and trustee's deed should issue to them, as their respective interests may appear. Said motion is based upon the ac-

companying petition, marked 'Exhibit A' and affidavits and statements on file in support thereof.

"Dated, this 1st day of October, 1898.        W. E. Crews,

"Attorney for Petitioners."

This motion was supported by affidavits setting out practically everything that is relied upon by the plaintiffs to recover in this action.

These affidavits were met on the part of the Pacific Coast Company by certain objections, and urging, among other things, that the question of the validity of the deed to Waterbury and Cooledge cannot be litigated in the manner and form asked for by the petitioner Kitty Cleough and others.

The petitioners and persons making the affidavits, and called the petitioners in said proceedings, filed an answer or reply to the objections filed by the Pacific Coast Company.

Upon these several pleadings, affidavits, etc., and the motion of the petitioners' attorney, notice was issued by Thomas R. Lyons, trustee for Juneau town site, which notice was in words and figures following:

"You and each of you will take notice that the motion and petition in the above-entitled matter hereunto attached will be heard at my office in Juneau, District of Alaska, on Wednesday, the 12th day of October, 1898, at the hour of ten o'clock a. m., or as soon thereafter as the same can be heard."

Service of the above-entitled notice and motion was accepted on the 1st day of October, 1898, by John R. Winn, one of the attorneys for T. Jefferson Cooledge and John I. Waterbury.

On the 1st day of November, 1898, the trustee of the town site of Juneau, Thomas R. Lyons, decided the matters referred to in said several affidavits, etc., and held that the trustee had no legal authority to recall the deed to the premises in controversy, quoting, in substance, a decision by the Supreme Court of the United States in words following:

"The issuance of a patent for land which is a part of the public domain, or the fee to which was in the United States, prima facie

passes the title whether such patent is valid or a void instrument without authority, and precludes the further exercise of departmental jurisdiction over the land until such patent is vacated by judicial action"—citing Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848; United States v. Schurz, 102 U. S. 378, 26 L. Ed. 167.

Notice of the decision of the trustee was served on the petitioners, which notice was accepted by his attorney on the 11th day of November.

On the 8th day of December, 1898, notice of appeal was served, and the case was taken to the General Land Office. Such proceedings were thereafter had that on May 22, 1899, the papers were returned to the trustee by order of the Secretary of the Interior, Hon. E. A. Hitchcock, directing that notice be served on Waterbury and Cooledge and the Pacific Coast Company that they are allowed 60 days in which to make full answer to said petition and accompanying papers, exhibiting therewith copies of deeds or evidences of title under which they claim, and upon such answer being filed the trustee was directed to return the papers to the department. Thereafter, on the 8th day of August, 1899, the answer of the Pacific Coast Company was filed, and the petition of the several plaintiffs, as required by the order of the Secretary of the Interior, to which was attached the deed and evidences of title of the company to the property in dispute.

Among the first papers was a copy of the resolution alleged to have been passed by the miners' meeting at the town of Rockwell, Alaska, March 26, 1881, approving the location of the wharf site by M. W. Murry, which resolution was in words and figures following:

"Resolved, that the miners and citizens of this district and city, recognizing that such improvements would be of public benefit, hereby accept, indorse, and recognize his right to the said wharf site improvements."

Which notice in its preamble sets forth the location of the wharf site and the purpose of Murry to build a wharf. There

is also attached to said papers the original notice filed by Murry on March 12, 1881, claiming the said wharf site.

The notice is in words and figures following:

"Notice is hereby given that the undersigned, M. W. Murry, hereby claims for building purposes and wharf purposes the following described plot of land, lying about ⅛ of a mile east of the town of Harrisburg, on the seashore, 600 feet square. The center line marked by a blazed tree and notice, and large boulder near low-water mark in line S., 25 deg. W., magnetic, and courses and distances are as follows:

"Commencing at stake and mound of stone, 1st, N., 25 deg. east, (600 feet) six hundred feet; thence, second, S., 65 deg. E. (600), six hundred feet; thence, 3d, S., 25 deg. W., (600) six hundred feet, to stake and mound of stone at low-water mark, and thence, 4th, N., 65″ W., 600 feet along the water line to place of beginning.

"Located March 6th, 1881.                    M. W. Murry.

"Witnesses:   F. Lagiabue,
          "N. Hilton.

"Recorded in Book A, Lode Claims, March 12th, 1881.
                              "R. Dixon, Recorder."

There was also attached to the various conveyances by Murrry and others, until the title vested in Waterbury and Cooledge, and finally the deed from Thomas R. Lyons, as trustee of the town site of Juneau, to Waterbury and Cooledge, and the deed of Waterbury and Cooledge to the Pacific Coast Company. There were also attached to this answer certain other conveyances by the plaintiffs of a portion of the ground in controversy along the shore line thereof, and running back 20 feet. All of these papers have been offered in evidence in this case, and are before the court on a stipulation of the parties.

On February 17, 1900, Frank Grygler, special agent of the General Land Office, was directed to notify the several parties in interest to appear before him at a specified time and place, and submit their evidence in support of the several allegations in the petition of the said natives to the answer and facts as stated therein by the defendant company.

All the papers were thereupon returned to Mr. Grygler and the evidence taken by him, all of which evidence by stipulation is again offered in evidence in this case. After the record of the special agent was made, returning the several papers to the Department at Washington, such proceedings were had that on July 19, 1901, after considering all the evidence in the case, the Secretary of the Interior made his decision, the closing paragraph of which is in the following words:

"Upon a careful consideration of the case as now presented, the department sees no reason for recommending proceedings looking to the cancellation of the trustee's deed, and the petition is therefore denied."

In July, 1901, Thomas R. Lyons, trustee, was notified by the Commissioner of the General Land Office of the decision of the Secretary of the Interior, and, it appearing that the attorneys had given notice that no further action would be taken in that department, the case was closed, and the trustee directed to notify the parties of such determination.

W. E. Crews and J. H. Cobb, for plaintiff.

Winn & Shackleford and L. P. Shackleford, for defendant.

BROWN, District Judge. Several questions considered by counsel of importance arise on the face of the proceedings. It is objected by defendant that the plaintiffs cannot properly sustain their suit because the same matters have been determined by the Department of the Interior, where the disposition of the public lands is lodged by law, and that this court is therefore without jurisdiction. It is also alleged that plaintiffs are sui generis, or surrounded by such disabilities that they are incompetent to sue.

It is also claimed by the defendant that the plaintiffs cannot maintain their action for the reason that their rights and interest in the property in dispute, if they have any, is several and not joint, and that no several interest is shown in this ac-

tion. The question further arises on the face of this proceeding as to whether the native Indians of Alaska, by reason of claims made to land on the 17th day of May, 1884, the date on which an enabling act was passed by the Congress of the United States creating a civil government in Alaska, can acquire title to lands so claimed and possessed by them.

The complainants' action is to set aside the several conveyances running from the town trustee of Juneau to Waterbury and Cooledge, and from them to the defendant Pacific Coast Company, or to have the defendants declared as the trustee of the complainants, and require them to convey the lands to the complainants.

If the complainants are without capacity to sue because of disabilities, or if this court is without jurisdiction to grant relief because of the former decision of the questions involved here by the Interior Department, or if, under the law, title to lands cannot be conveyed to the native Indians of Alaska, then the relief prayed for, so far, of course, must be denied.

Again, the further question is presented for consideration, namely, if the lands in dispute were in possession of the native Indians in May, 1884, and have been in their continuous and exclusive possession since that time, is the patent issued for the same void, and should it be so declared?

Considering, briefly, the first proposition, it is sufficient to say that when a patent has once issued for public lands of the United States, that the duties of the Interior Department have been fully performed, and that such department cannot lawfully further consider the rights of contesting parties to such lands; that a patent should be set aside by a court of competent jurisdiction, and that the department has no power to take such action. Moore v. Robbins, 96 U. S. 530, 24 L. Ed. 848; United States v. Schurz, 102 U. S. 378, 26 L. Ed. 167.

The patent to this town site land, or for public lands within the lines of the Juneau town site, was issued September 4,.

1897. The government having parted with its title, and the title having fully vested in Olds as trustee, it is difficult to perceive what power or authority the Interior Department had over the lands within said exterior bounds of the town site, except, perhaps, to see that the land was conveyed by the trustee in the form of town lots to persons entitled to receive the same.

The trustee duly appointed had conveyed these lands to Waterbury and Cooledge by a good and sufficient deed, and this had been delivered to said parties before any action was taken by these complainants, either before the trustee or otherwise. But whether the Interior Department had or had not any right or authority in the premises after patent and deed had been made, such action would not devest this court of jurisdiction under proper conditions and in a proper case-made.

Where a patent has been awarded to a party as against a contestant, under a mistake of law, it is held that an action may be brought in a court of equity, and the title to the property awarded to the person lawfully entitled to the same, notwithstanding that patent had issued to the other party. Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485. See Stark v. Starr, 6 Wall. 402, 18 L. Ed. 925; Silver v. Ladd, 7 Wall. 219, 19 L. Ed. 138; Monroe Cattle Co. v. Becker, 147 U. S. 47, 13 Sup. Ct. 217, 37 L. Ed. 72. See, also, United States v. Winona & St. P. R. Co., 67 Fed. 948, 15 C. C. A. 96, and Holland v. Buchanan (Utah) 56 Pac. 561. The objection to the jurisdiction of the court does not seem to be well taken.

No evidence is offered touching the disabilities of these parties, except what might be gathered from the names and the further facts that they are native Indians of Alaska.

The disabilities preventing persons from suing under our statute are infancy, persons who are insane or of unsound mind. No such objections are urged against these complain-

ants. If they were under disability, then a guardian ad litem might be appointed to protect their rights and interests in court. The native Indians of our country have been treated by the general government as aliens, and having no further rights than aliens until they become citizens under the law; but aliens may sue and defend suits in all the courts of our country, and to the same extent that citizens may, and may enforce their rights to such property as they are permitted to acquire and hold to the same extent as citizens. Certainly, these native Indians of Alaska cannot be treated with less consideration in our courts than aliens. I see, therefore, no good reason for holding that these complainants are surrounded by such disabilities that they may not come into the courts of Alaska on an equal footing with all others, and maintain whatever rights the laws vest in them. Mosgrove v. Harper (Or.) 54 Pac. 189; Felix v. Patrick (C. C.) 36 Fed. 457; Id., 145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719.

This objection is not considered by the court with favor. It is well known that the native Indians of this country by their peculiar habits live in villages here and there, in some of which they remain most of the year and in others during certain summer months; that while their habits are somewhat migratory, they have well-settled places of abode, and these usually are not abandoned, though they may vacate them for a few months at a time. The history of the habits of these people is well understood.

Section 8 of the act of May 17, 1884 (23 Stat. 26, c. 53), contains the following proviso:

"That the natives or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them, but the terms under which such persons may acquire title to such lands is reserved for future legislation by Congress."

It is believed that the language of this act does not refer to lands held by Indians in severalty, but as to holdings by them

collectively in their villages and such places as were occupied by them; that their methods of life were well understood by the lawmaking power, and that they were understood to occupy lands in common either in villages where they lived, or for fishing, hunting, and like purposes.

No doubt I think exists as to the rights of those Indians who had occupied some particular tract of land solely and exclusively by himself, and had actually occupied the same continuously before and at the time and since the passage of the act of May 17, 1884. He could maintain his possessory right to this property by virtue of this act, and the rights of the native might and should have protection under such circumstances. But it is evident to the court that the native Indians who occupied the land in dispute, if they occupied it exclusively and continuously, if they were in the actual undisputed possession thereof at the time the act of 1884 went into effect, were occupying it as a village, where a number had settled, and were there as common occupants, and not as individual claimants to any particular portion of the same. If they occupied the same exclusively as a village or otherwise, their right to the same must be protected, if protected at all, under section 8, above referred to. If the Congress of the United States have made no provision for this class of residents acquiring title to lands since the act of 1884, then they may not obtain title.

The act of March 3, 1891 (26 Stat. 1099, c. 561, § 11 [U. S. Comp. St. 1901, p. 1467]), provided that, until otherwise ordered by Congress, lands in Alaska may be entered for town site purposes for the several use and benefit of the occupants of town sites by such trustee or trustees as may be named by the Secretary of the Interior for that purpose, such entries to be made under the provisions of section 2387 of the Revised Statutes, as near as may be.

This section of the act of 1891 simply provides for taking town sites by trustees instead of probate judges or county

judges, as was provided by the section to which reference is made in this act. It cannot be considered as legislation tending in any way to give title in lands to the native Indians of Alaska.

Section 14 of said act in part reads as follows:

"That none of the provisions of the last two preceding sections of this act shall be so construed as to warrant the sale of any lands belonging to the United States which shall contain the precious metals or any town site or which shall be occupied by the United States for public purposes or which shall be reserved for such purposes or to which the natives of Alaska have prior rights by virtue of actual occupation."

This last section refers to the manner of surveys, and payment, etc., for trade or manufacturing sites. The quantity of land that could be taken for these purposes, namely, trade or manufacture, is limited by this act to 160 acres. None but citizens could acquire these lands, and none but citizens of the United States can acquire lands of the United States for any purpose. The provisions of the town site law do not contemplate that even title to town lots should vest in aliens.

Considering all the legislation affecting these matters, it is evident that Congress never intended that the natives of Alaska could become the owners of town lots in any town that might be located under the act of Congress, or that they could acquire title to lands in any other way. The evident purpose of Congress is to protect the natives in the possession of lands continuously claimed and occupied by them, and up to this time Congress has not legislated, so far as the court is advised, fixing the terms under which natives might acquire title to lands in Alaska. It is evident, therefore, that the complainants in this action cannot have so much of the relief prayed for as would declare that the defendants were holding the land in trust for their benefit, or require them to convey to the several complainants.

2 A.R.—16

The only question reserved for the court to pass upon and to determine is this: If these several complainants or if the natives of Alaska were occupying the lands in dispute, if they were actually in their sole and exclusive possession and were claimed by them on May 17, 1884, and had been in their exclusive possession theretofore, and remained in their exclusive possession until September, 1897, when patent was issued by the government to these lands as a town site, were the lands unlawfully patented at that time? No authority had been vested by Congress in any department of the national government to grant lands, by patent or otherwise, to any person or persons who were citizens of the United States that were occupied and possessed solely and exclusively by the native Indians of Alaska. Inasmuch as no such authority existed, if these lands were so occupied, clearly the patent issued by the United States to so much of the lands, if any, as were thus occupied by the natives was issued without authority of law, and is absolutely void.

The court now reverts to the single proposition before it, namely, under the facts and circumstances of this case, and considering the history of the case and all the testimony before the court, were these lands solely and exclusively occupied by the natives of Alaska in 1884 and at the time patent was granted thereto in 1897, and had their occupancy been open, notorious, and continuous during all this time, and to the exclusion of all other claimants? Upon this question of fact the testimony before the court is very contradictory. The crucial point in the testimony, as viewed by the court, arises out of the facts of the occupancy as they existed in March, 1881. On March 6, 1881, M. W. Murry located what he calls a wharf site 600 feet square running along the tide waters of Gastineau Channel, and running back 600 feet. The notice is found in the evidence in this case, and was attached to the pleadings of the respondent in the proceedings before the Department of the

Interior, and was offered in evidence here. The lines and distances are given in the notice that was placed upon the claim. This notice seems to have been filed for record in the mining records (the only record then extant) by Mr. Murry on March 12, 1881.

A meeting of the miners of the town of Rockwell, sometimes called Harrisburg, and later Juneau, seems to have been held March 26, 1881, and the location of the wharf site by Murry approved. It will also be remembered that at this time there were native Indians of Alaska living along the water front of Juneau, but, as generally described, living at points further west or northwest, perhaps, than the place where the wharf site was claimed. The weight of the evidence in this case seems to show that at the time of the location of this wharf site no part of the same was occupied by the native Indians of Alaska. That the Indians were removed from the water front of Juneau, then called Rockwell or Harrisburg, to a point shortly below where the wharf called the "Carroll Wharf" was constructed, is evident; but the initial right of occupancy, so far as I can determine from the evidence, seems to have been in Murry when he made his location. Here was notice to all that he claimed this tract of ground 600 feet square, and that he was claiming it for the purpose of a wharf site. The publicity of the claim became very apparent when a miner's meeting was called to deliberate upon the rightfulness of the same. Whether the Indians occupied some portion of this ground before the wharf was constructed is in my opinion not very material. That the locators of the wharf site should use reasonable diligence in their efforts to construct a wharf and to occupy the ground claimed after the claim was made there is no doubt. The evidence indicates that construction was begun very shortly after the claim was made, and it proceeded with such a degree of diligence that it was so far completed that an ocean ship under the control of Capt. Carroll, and as shown by his

logbook and his testimony, landed at this wharf in the month of July, 1881, and discharged its cargo, though it is said that the wharf was not fully completed at that time; that the wharf was shortly after completed, and was used from year to year until the new wharf was completed in front of the town of Juneau; that the wharf has been used more or less from its construction up to the present time; that buildings that were erected upon the wharf, and near the shore end thereof, have been occupied as storehouses, etc.

Mr. Webster, a man well known in Juneau, and whose reputation for truth and veracity has not been attacked, and therefore stands unimpeached before the court, states that he with his father were in chage of the wharf from 1884 until 1894. He testifies that he and his father notified the Indians that came upon the ground from day to day to keep off the property, and refused to allow them to build thereon. That certain Indians were hired to work on the wharf during its construction is shown by other white witnesses, and they were permitted to live on the ground. Webster testifies that two of these were employed, and they were put there to watch other Indians, and to notify them they could cut no timber on this land. Mr. Webster also testifies that the Indians that came upon the ground between 1884 and 1894 were notified that the ground belonged to Carroll and Murry, and that they had full knowledge of the claims of Carroll and Murry to the ground. He also explains how 600 feet along the shore line was necessary for use for wharf purposes. Capt. Carroll also explains this matter, and testifies that no Indians were there when he first came in March, 1881. Capt. Wallace testifies upon the same subject as to the occupancy of the land by the company; that he was running as mate for a considerable time, coming to Juneau every month. Other witnesses testify in the same way. A number of native witnesses testify that the Indians did not occupy this land, and had not occupied it prior to 1881,

and that they knew that the ground was claimed by the wharf people. Quite a number of Indians testified that these lands had been occupied for a great period of time, but mainly since 1881. One Indian testified that he can only give them the ancient date on which the Indians raised potatoes upon this ground by counsel furnishing him the date when our Creator made Indians. It is evident, however, that the potato raising referred to was not upon this particular land, but land that was embraced within the town of Juneau at a point further up the channel. A number of white witnesses testify to Indians occupying a portion of this land (namely, lots R, S, and T, the ground below the old Carroll wharf) from some time in 1881 up until the time the town was patented, and that they were still occupying this ground, and that they were occupying these particular blocks R, S, and T, or portions of the same, and that they had the exclusive occupancy; but all admit that the wharf remained upon the ground, and that the wharf was used and occupied more or less during the whole time up to the date of the building of the new wharf.

Counsel seems to be of the opinion that certain portions of the wharf site designated as blocks R, S, and T being occupied by the Indians, although claimed by the wharf site people, was an exclusive occupation; in other words, that the wharf site company should have its foot upon every inch of ground within its claim in order to hold it and in order to exercise possessory rights over it. The court is not in sympathy with that contention. It is said that the wharf site was surveyed; that its corners were distinctly marked upon the ground by monuments; that the wharf was built at the center; that large posts were set in the ground at each corner, and were used for the purpose of hitching lines from ships taken ashore, in order to hold them safely; that these posts were not only set at each end of the 600 feet claimed, but were also set 150 feet from each side of the wharf. The wharf company were taking

more or less timber from the land. They were constantly caring for the timber by keeping watch over it to protect it and to keep Indians from cutting it.

If the Indians were in possession of any of this land, it would be what they occupied with their houses; it would not be the possession of lots or blocks, but it would be the possession of such ground as they occupied with their homes and for such purposes. To authorize a court of equity to set aside a patent issued by the Interior Department of the government, there should be the clearest and strongest proof of occupancy by the natives on or before 1884, and continuously down to the time of the deed made to Waterbury and Cooledge. The court cannot hold that there is such certainty of proof or that degree of certainty of proof required to entitle the court to set aside the patent presented in this case. The evidence of the natives on their side upon a question of this character is of very slight value, it is believed. The evidence of the white men is very conflicting, and, taking it all in all, where the events testified to occurred 20 odd years ago, necessarily there must be much uncertainty as to the facts.

It may be that the deeds to Waterbury and Cooledge were made without authority of law, and upon a suit by the United States the same would be set aside. There can be no doubt that deeds by a trustee of a town site, under the law of the United States, should be made only to persons competent to receive title, and in the actual and lawful possession of the lots conveyed. Hussey v. Smith, 1 Utah, 129; Pratt v. Young, 1 Utah, 347; Holland v. Buchanan (Utah) 56 Pac. 561; Singer Mfg. Co. v. Tillman et al. (Ariz.) 21 Pac. 818; Clark v. Titus (Ariz.) 11 Pac. 312. The right to a deed does not depend wholly upon occupancy at the time it is made; but if the right existed, at the time application for town site entry was made, in the persons then in occupancy and possession, such persons would have the preference right to a deed if they or their grantees

continue to occupy said premises until deed is passed by the trustee. Singer Mfg. Co. v. Tillman, supra; Lockwitz v. Larson (Utah) 52 Pac. 279; Sturr v. Beck, 133 U. S. 541, 10 Sup. Ct. 350, 33 L. Ed. 761.

Entry of the town site of Juneau was ordered, as appears by the evidence, September, 1893; just when application was made does not appear. By the evidence of Webster, before referred to, it appears that he and his father were holding possession of the wharf until 1894, and that freight and passengers were being discharged from ships upon the wharf. Not only this, but that the natives were being daily notified of Murry and Carroll's claim of title to the 600 feet square, and were being prevented from cutting timber and wood thereon, and notified to keep off the land.

That natives were on the land at that time is conclusively shown by the testimony of white men, but were they making claim to it as their own, and were they in the exclusive occupancy of the same? Counsel for plaintiffs would unhesitatingly answer "Yes," and counsel for defendant with equal candor and frankness would answer "No;" but the court cannot be controlled by declarations of counsel. That the wharf people were exercising some dominion and control of this land, from all the testimony fairly considered, must be admitted. The contention of counsel is that the wharf people did not occupy blocks R, S, and T. What are the facts about this? They had large posts set in the ground near the shore, to which hawsers were attached, as well as to those at or near the outer lines of block T. In this way some use was being made of the ground claimed for wharf site in 1893 and prior thereto. White witnesses testify that these outposts were convenient and necessary in connection with the wharf in order to hold large ships, etc., and there is no contradictory evidence upon this point.

Then counsel for plaintiffs seem to contend that all parts of the 600 feet square should have been occupied in order to show

possession. The wharf was built out from the shore, starting at a point about the center of the 600-feet square tract. If the entire length of said tract along the water was used for wharf purposes, and was necessary therefor, such use for the business of the wharf was occupancy. But it is said that these lots were surveyed and subdivided by order of the town trustee; that, the 600-feet square tract being so subdivided, occupancy of so much of the land at the end of the wharf as the wharf covered, if one lot or block, would be the only occupancy of the wharf people. I am unable to understand how the possessory rights of a holder of lands within the proposed town site, occupied or used for business purposes at the time of application for entry of town site, can be devested of such right to continue such occupancy, and obtain deed to business property, though the town site trustee should have the tract divided and subdivided into blocks and lots.

The town site act of Congress contemplates the entry of land then generally occupied for residence and business purposes. The court is of the opinion that persons occupying a reasonable quantity of land for manufacturing, business, house, or for a wharf may obtain title to such land under the town site act; that persons are not necessarily restricted to a single lot, the size of which may be fixed by an arbitrary rule of the trustee.

It may be well to bear in mind that the act of 1884 protected white men and citizens in their possessory rights and claims to land as well as the native Indians of Alaska; the language of the proviso of section 8 being as follows: "That the Indians or other persons in said district shall not be disturbed in the possession of any lands actually in their use or occupation or now claimed by them." Evidently, Congress has by the town site and trades act of March 3, 1891, provided how others than Indians may acquire title to certain lands to which they have possessory rights by use and occupation.

It being true that 600 feet square of land was claimed by Murry for a wharf site in 1881, and it appearing that he and his assigns undertook to hold possession thereof from that time forward until after the town site entry was made, and thereafter undertook to exercise some claim and dominion over the same, this court cannot hold that the proof of the plaintiffs is sufficient to justify the court to set aside the patent for the lands in dispute heretofore issued by the national government. Relief to the plaintiffs is denied, and plaintiffs' bill dismissed.