UNITED STATES v. SMITH et al.

UNITED STATES v. WERNER et al.

(Circuit Court, D. Oregon. September 12, 1910.)

Nos. 3,319, 3,320.

1. PUBLIC LANDS (§ 120*)—STONE AND TIMBER ENTRIES—FRAUD—EVIDENCE.
   Evidence *held* to require a finding that certain stone and timber entries were fraudulent, and not made for the sole benefit of the entrymen.
   [Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 120.*]

2. PRINCIPAL AND AGENT (§ 177*)—NOTICE TO AGENT AS NOTICE TO PRINCIPAL.
   Where the agent of defendant S. had knowledge of the fraudulent acquisition of title to certain public timber land, and assisted the entrymen in procuring title from the government, intending thereafter to obtain the lands for S., and, this having been accomplished, S. organized a corporation which was a mere holding company formed by himself and other members of his family, to which the lands were conveyed in exchange for stock, neither S. nor the corporation could be regarded as bona fide purchasers without notice.
   [Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 670–679; Dec. Dig. § 177.*
   Bona fide purchasers, see note to United States v. Detroit Timber & Lumber Co., 67 C. C. A. 13.]

3. PUBLIC LANDS (§ 108*)—FRAUD—INTERIOR DEPARTMENT—DETERMINATION BEFORE PATENT—EFFECT.
   Where a decision of the Secretary of the Interior directing that certain fraudulent stone and timber claims be passed to patent was brought about by false and fraudulent proof and affidavits, such determination was no bar to suit by the government to vacate the patents.
   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 304, 300·
   Dec. Dig. § 108.*]

4. PUBLIC LANDS (§ 120*)—PATENT—SUIT TO VACATE—PARTIES.
   In general, the holder of the legal title to land is an indispensable party to a suit to set aside the patent.
   [Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 120.*]

5. LIMITATION OF ACTIONS (§ 119*)—OPERATION OF STATUTE—TIME.
   The statute of limitations does not cease to run in favor of the holder of the legal title to land as against a suit by the United States to set aside the patent until he is made a party to the suit and process issued and placed in the hands of the marshal with a bona fide intent that it be served.
   [Ed. Note.—For other cases, see Limitation of Actions, Dec. Dig. § 119.*]

6. PUBLIC LANDS (§ 120*) — FRAUDULENT ENTRIES — SUIT TO VACATE—LIMITATIONS.
   Under Act March 3, 1891, c. 559, 26 Stat. 1093 (U. S. Comp. St. 1901, p. 1521), providing that suits by the United States to vacate patents to public lands shall only be brought within five years from the passage of the act, and suits to vacate and annul patents subsequently issued shall only be brought within six years after the date of the issuance of the patent, suits to vacate patents for fraud are barred after six years from the date of the patent, and not from the date of the discovery of the fraud.
   [Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 120.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. PUBLIC LANDS (§ 120*)—FRAUDULENT ENTRY—VACATION OF PATENT—LIMI-
TATIONS—PARTIES.

    Certain public timber land having been fraudulently entered and patents
having been issued, the land was conveyed to S. or for his benefit, and he
organized a corporation, he and members of his family owning all of the
stock. To this corporation the land was thereafter conveyed. Within six
years from the date of the patent, suits were brought by the United States
against S. and others to set aside the patents as to most of the land, but
the corporation was not joined until after the six-year period had expired.
    Held, that the corporation under such circumstances was not a bona fide
purchaser; and that neither it nor S. was entitled to claim that the suits
were barred by reason of the corporation's nonjoinder until after the time
had expired.

    [Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 120.*]

Bills by the United States against C. A. Smith and others and
against Nils O. Werner and others. Decrees for complainant in each
case.

John McCourt, U. S. Atty.
A. H. Tanner, for defendant Kribs.
W. W. Banks and L. H. Tarpley, for entrymen.
Dolph, Mallory, Simon & Gearin and Ueland, Lind & Jerome, for
defendants Smith, Werner, and Linn & Lane Timber Co.

BEAN, District Judge. These two suits were brought by the government
to set aside and vacate divers patents for public lands issued
to sundry persons under the timber and stone act (Act June 3, 1878,
c. 151, 20 Stat. 89 [U. S. Comp. St. 1901, p. 1545]), and were tried
and submitted together. There are 28 patents involved in case 3,320
and 17 in case 3,319. The filings in 3,320 were made on January 19,
20, 22, 23, and 31, and on February 1 and 26, 1900, and final proofs
were made on April 18th, 19th, 20th, and May 16th. The land was
conveyed at the time or within a few days after final proof to John
A. Willd in trust for defendant C. A. Smith. On November 2, 1900,
Willd conveyed it to defendant Greacen. February 11, 1901, Greacen
conveyed to Rogers, and December 21, 1904, Rogers conveyed to
Werner, all in trust for Smith, which deeds were all promptly recorded
and the legal title stood in the name of Werner until it was
subsequently conveyed to defendant Linn & Lane Timber Company
as hereinafter stated. The entries in 3,319 were made in May, June,
and July, 1900, final proof submitted in August and October, and
the land conveyed by the several applicants to the defendant Kribs
in trust for Smith about the date of final proof. On October 24,
1904, Kribs conveyed an undivided three-quarters thereof to Smith,
and on December 28th of the same year conveyed the other undivided
one-quarter to Swenson in trust for Smith, which deeds were also
promptly placed of record. The title thus stood until it was subsequently
conveyed to the Linn & Lane Timber Company, as hereinafter
stated. After the several applications in 3,320 had been filed
and prior to final proof, a special agent of the Land Department, who
made a partial investigation of the matter, reported that he had reason
to believe they were fraudulent, and the Commissioner of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

General Land Office subsequently directed Special Agent Stratford to investigate the several entries, as well as those in 3,319, and report thereon. On March 9, 1901, Stratford reported recommending the issuance of patents, but, his report being unsatisfactory, he was requested to continue his investigations. During the summer of 1901 Stratford obtained affidavits from the several entrymen and from defendants Puter and Kribs, and one McKinley, which he later submitted to the department together with a report in which he intimates that in his opinion the entries were fraudulent and patents should be withheld. In March, 1902, A. R. Greene, a special representative of the Secretary of the Interior, made a report to his superior giving at some length the circumstances surrounding the entries, but without accompanying proof or recommendations. Subsequently the Secretary of the Interior directed the Commissioner of the General Land Office to transmit the several reports and matters concerning these entries to his office, and after examination the Secretary, on the 17th of May, 1902, directed that the claims be relieved from suspension and that patents issue therefor, which was done accordingly. The patents involved in case 3,320 are dated August 12, 1902, eight of those in 3,319, the 9th of July, 1902, and the remainder August 12th of that year. In May, 1906, the defendant Smith, having previously acquired about 52,000 acres of timber lands in Linn, Lane, and Douglas counties, including those involved in these suits, organized under the laws of Minnesota a corporation known as the Linn & Lane Timber Company, with capital stock of $100,000, divided into 1,000 shares of $100 each, for the purpose of taking and holding title to these lands. Nine hundred ninety eight shares of stock were subscribed by Smith, and one share each by his wife and his attorney. Immediately after the organization of the corporation by the election of Smith as president, Johanna Smith, his wife, as vice president, Vernon Smith, his son, as secretary, and Nan A. Smith, his daughter, treasurer, and on June 4, 1906, Smith tendered to the directors of the corporation, consisting of himself, his son, and his wife, a deed executed by himself and wife for his lands in the counties referred to in payment of the stock of such corporation, and the same was accepted. On May 28 and August 15, 1907, respectively, Swenson and Werner, at Smith's request, conveyed the interests held by them to such corporation. The deeds from Smith, Swenson, and Werner to the corporation were retained by Smith and not filed for record in the proper county until the 9th day of September, 1908, more than six years after the issuance of the patents involved in these cases.

The bills of complaint in these suits were filed on May 25, 1908. In case 3,320 the majority, if not all, of the entrymen were made parties, also, Werner, Greacen, Rogers, Smith, Kribs, and Puter. The bill alleges that prior to the several entries involved in the suit an unlawful agreement was entered into between Puter, Smith, Werner, Willd, Greacen, Rogers, and Kribs, together with other persons to the complainant unknown, to defraud the government out of the title to the lands in this suit by procuring persons to enter the same for the use and benefit of such conspirators, and that Smith acquired the title with notice of such fraud. In case 3,319, the several entry-

men, together with Smith, Kribs, Swenson, O. J. and W. R. Mealey, and J. A. Thompson, were made parties. The bill charges a similar unlawful agreement or conspiracy between Smith, Kribs, Swenson, O. J. and W. R. Mealey, and J. A. Thompson, and other parties to the complainant unknown, and that Smith had full knowledge of such fraud when he acquired title. Subpœnas ad respondendum were issued upon the filing of the bills and placed in the hands of the marshal for service, and were in due time served upon the resident defendants. Smith, Swenson, and Werner were nonresidents of the state, and in July the marshal returned the subpœnas without service. On July 27th, upon the application of the district attorney, a warning order was issued to them which was subsequently duly served. In September and October Smith, Kribs, and Werner, and perhaps some of the other defendants, filed pleas in abatement, alleging that the property in controversy had been conveyed to and was owned by the Linn & Lane Timber Company prior to the commencement of the suits, and that it was therefore an indispensable party. On November 16th the complainant filed amended bills making the Linn & Lane Timber Company a party, and subpœna was issued and placed in the hands of the marshal for service upon its resident agent, and service was subsequently had. The amended bills contain substantially the same allegations as the originals, with the addition that the Linn & Lane Timber Company was organized by Smith for the purpose of defrauding the government and to consummate the fraudulent acquisition of title to the lands involved in these two suits; that the deed from himself to the company was not made in fact until after the commencement of these suits, but was antedated for the fraudulent purpose; and that all the deeds were concealed and kept from record in pursuance of such fraudulent purpose. Answers were subsequently filed denying the averments of the bill, and setting up as affirmative defenses (1) that Smith and the Linn & Lane Timber Company were purchasers of the property in good faith and without notice of any fraud; (2) that the decision of the Secretary of the Interior directing that the claims pass to patent is conclusive on the government in this suit; and (3) that the suits are barred by the statute of limitations because not commenced against the Linn & Lane Timber Company within six years from the date of patents. Replications were filed in due time, and, upon the issues thus joined, the evidence was taken in open court, and the cases submitted for decision upon the law and the facts.

The evidence is voluminous, and I shall not attempt to review it in detail, but shall state briefly the conclusions reached after a careful consideration of the testimony and the law applicable thereto.

There are substantially four questions presented for decision: First, whether the entries involved in these two suits were fraudulent; second, whether the defendant C. A. Smith was a party to such fraud or a purchaser of the property in good faith for a valuable consideration and without notice thereof; third, whether the government is concluded by the decision of the Secretary of the Interior that the entries should be passed to patent; and, fourth, whether the suits are barred by the statute of limitations.

Upon the first question but little need be said. It is, I think, very clearly established by the testimony that all the entries involved in both suits were fraudulent. In 3,320 the testimony shows that early in January, 1900, one of the Mealeys, who is a defendant in 3,319, called upon McKinley at Albany, and told him that there was a large tract of valuable timber land belonging to the government in the eastern part of Linn county, some 30 or 40 miles distant from Albany, which had recently been surveyed; that the Northern Pacific Railway Company then had cruisers in the timber estimating it preparatory to taking it under the lieu land law, and inquired of McKinley whether or not some method could be devised by which the title could be acquired. McKinley thereupon interviewed the defendant Puter, with whom he had been previously operating very largely in timber lands in this state, and, after a conference between them, it was agreed that they would acquire the title by procuring persons to make applications for the land under the timber and stone act, and would subsequently sell and dispose of it if they were able to do so. In pursuance of this understanding, they entered into an agreement with Mealey to pay him $10 for each claim he would show them or applicants furnished by them, and persons were thereupon solicited to make application for the land, Puter and McKinley agreeing to meet all expenses, pay the purchase price of the land, and each applicant from $75 to $100 for his trouble. Fifty-seven persons were thus procured to make applications to enter lands under the timber and stone act. Many of these persons resided in Albany and Salem, and some of them in Portland. They were taken in groups by McKinley or some of his assistants to Roseburg where they made the filings; the expenses incident to the trips being paid by McKinley. After the filings had been made, McKinley arranged for the publication of notices of final proof, and, when the proper time arrived, notified the applicants and took them to Roseburg, paid all their expenses, and, upon the making of final proof, they were paid the stipend agreed upon. It is clear that none of the applicants took the land for their own use and benefit, but for the use and benefit of Puter and McKinley.

The same may, I think, be said of the entries involved in case 3,319. They were all made through the defendants the Mealey brothers and Thompson, with the understanding on the part of the several entrymen that all expenses and the purchase price of the property would be paid, and that each applicant would receive $50 for his trouble. It is true there was no express agreement with the several applicants in either case that the entries should be made for the use and benefit of another, but this is the effect of the entire testimony. As Puter states in his testimony, the conspirators studiously avoided entering into such an express contract or agreement, for they knew it would be such an evidence of fraud as would invalidate the entry, but caused it to be reported, and the applicants to be advised by other parties that, if they would make the applications, they would receive upon making final proof the stipulated sum, and they acted on such understanding in making the applications and subsequently conveying the property as directed by Puter and McKinley and Mealey.

The next question is whether or not Smith was a party to the fraud

or a purchaser of the property in good faith, and for a valuable con-- sideration and without notice. The evidence in 3,320 shows that, im- mediately after the first entries were made, Puter went East for the purpose of looking up a purchaser for the land. After interviewing several parties, he finally interested the defendant Smith, who gave him a letter of introduction to his (Smith's) agent or representative on the coast, the defendant Kribs. Puter met Kribs in San Francisco, and presented this letter of introduction some time in February or about the 1st of March, 1900, and later, about the middle of March, Smith came to San Francisco, and there he and Kribs had an inter- view with Puter about the matter. The parties do not agree as to what transpired at that interview. Kribs says that Puter told them that he had located 57 pieces of land in Oregon, and had agreed to furnish the locators money with which to make final proof for which he (Puter) was to receive a location fee of $200 for each claim; that the time was approaching when final proof must be made, and that he had had considerable trouble to raise the money and desired to make an arrangement by which the applicants could borrow the necessary money with which to make final proof and pay the location fee; that he gave a description of the land, the quality and quantity of timber thereon, and said that the land had been taken by "a lot of poor fellows," and that, after they had proved up, there would be but little trouble in purchasing it from them. Smith's version of the transaction does not accord with that of Kribs. Smith says Pu- ter claimed that he had 8,000 or 9,000 acres of land in Linn county for sale; that it would average 75,000 feet of timber to the acre, was comparatively level, and a splendid logging proposition; that the timber was a fine quality of yellow fir, and was tributary to driving streams which would make it practicable to drive the logs to Port- land; that he offered to sell the lands for $6 an acre, and "I told him, in substance, that if the timber was as he claimed, and the topography of the country and the streams, I would take the lands. Mr. Kribs was present at the conversation, and then we had an understanding there at that time that some time in the near future, when Mr. Kribs would get up, he would go and look these lands over, and, if he found the lands as Mr. Puter claimed, then I would take them. In other words, Mr. Kribs should be the judge whether the lands and every- thing was in accordance with the representations of Mr. Puter." Smith also testifies that there was nothing said concerning the title to the lands or of the entries having been made under the timber and stone act, or that it was necessary that final proof should be made before they could be disposed of. In this regard, Smith is corrobo- rated by Puter, who testifies that he offered the lands for sale to Smith, and that Smith agreed that Kribs should come to Oregon, ex- amine them, and, if he found them satisfactory, to make the purchase. So I take it to be clearly established that Kribs was the agent of Smith, with power and authority to purchase the lands and came to Oregon for that purpose. He arrived in Albany about the 1st of April, 1900. Prior to that time, the Northern Pacific Railway Company had filed a contest against each of the entries on the ground that they were fraudulent, alleging that they were not made for the use and benefit

of the several entrymen but for other parties. McKinley was under arrest charged with subornation of perjury in the matter of such entries. Kribs was advised of these facts, but notwithstanding he had operated in timber lands for some time, and was familiar with the requirements of the timber and stone act, he went ahead and examined the land, and concluded to purchase it from Puter for Smith, but, on account of the controversy over the title, the price was reduced to $5.25 an acre. Subsequently, when the time arrived for the first applicants to make final proof, a hearing was begun on the contest of the Northern Pacific Railway Company, and, after it had continued for about two days, it was postponed in order that Puter might effect a compromise with the railway company. Kribs was in Roseburg (where the local land office is located and the hearing had) during this time, and knew of these matters. After the hearing had been postponed, Puter went to Tacoma, the head office of the Northern Pacific Railway Company, and there a compromise was entered into between him and the railway company, by which he was to secure relinquishments from 24 of the applicants, and the railway company was to dismiss its contest as to the remainder. The agreement was carried into effect. Puter secured the 24 relinquishments, compromising with the applicants by paying each of them about $25 therefor in place of the $100 first agreed upon, and on the 18th of April, 1900, the railway company dismissed its contest as to the remainder. The several entrymen were thereupon notified by Puter and McKinley, and on the same day 16 of them appeared at the land office and tendered their final proof. After the final proof papers had been made and signed by the applicants, but before they were accepted by the land office, the applicants were taken into the office of Kribs' attorney, adjoining that of the land office, and there executed to Kribs a mortgage on the land described in their several applications to secure the payment of the sum of $600. After these mortgages had been executed, Kribs paid to the land office the purchase price of the land and the necessary fees, and furnished the money with which each of the applicants was paid the stipulated sum of $75 or $100 for making the entry. A few days later, and within a week, deeds were secured from all these applicants conveying the land by Kribs' direction to John A. Willd in trust for the defendant Smith, which deed was delivered by Puter to Kribs, and Kribs thereupon paid to him the balance of the purchase price of the land. The same course was pursued in regard to each of the other applicants when they made their final proof. The money used by Kribs for this purpose was furnished by Smith, and Kribs was acting for Smith in the transaction.

The lands involved in case 3,319 are adjoining or in the same vicinity as the lands involved in 3,320. Soon after Kribs and perhaps Smith had visited that section of the country and examined the timber growing on the government land, it became currently reported in the community that any person located upon timber land by the defendants Mealey and Thompson would receive $50 for doing so. In pursuance of this rumor and report, the several applicants whose patents are involved in the suit applied to the Mealeys and Thompson to be located upon government land, and were so located. They were taken to

Roseburg to make final proof by the Mealeys or Thompson, all the expenses of the trip being paid, both attending the initial filing and the final proof. When the final proofs were submitted, the same course was pursued in the matter of the mortgage and transfer of the property as in 3,320, except that the deeds were made by the applicants to Kribs in trust for Smith. The money with which to pay for, the land, the land office fees, and the stipulated stipend to the several applicants was Smith's money and furnished by Kribs, and the transaction was for Smith's benefit. There is no direct testimony in this case that there was any understanding or agreement with Kribs to furnish the money with which to pay for the land, and pay the several expenses attending the location, and the amount due the locators prior to the initial application, but it seems to me that the conclusion is irresistible that such was the case. Neither the Mealey brothers nor Thompson had any money with which to carry on this enterprise. The land was in the vicinity of that acquired by Smith through Puter and McKinley. It was practically the same character. The filings were made after Kribs had commenced acquiring title in that vicinity. Mealey was familiar with this, and had assisted Puter and McKinley in their enterprises. The same method was pursued in order to acquire title, and I am of the opinion that the transaction was substantially of the same character and for the same purpose. I have no doubt that Kribs, not only had knowledge of the fraudulent character of the entries involved in these cases, but was an active participant in consummating such fraud. He was advised of the contest of the railway company, of McKinley's arrest, and of the hearing of such contest before he consummated the deal. In addition to this, the circumstances surrounding the transaction, the manner in which it was carried out, and the apparent attempt to conceal its real nature are strong badges of fraud, and I think no one can read this record without coming to the conclusion that it was a fraudulent transaction to which Kribs was a party. It may be true that Smith, his principal, had no actual knowledge of such fraud, although the evidence would be more satisfactory upon that point if the correspondence between him and Kribs and Puter concerning this transaction had not all been destroyed about the time the matter was being investigated by a federal grand jury, and it was rumored or reported that Smith and Kribs were liable to be indicted, and that the government was contemplating bringing a civil suit to cancel and set aside the patents. But, whether Smith had actual knowledge of the fraud or not, Kribs was his agent, authorized to purchase the property, and whatever knowledge Kribs acquired is chargeable to Smith. I conclude, therefore, that Smith was not a bona fide purchaser for value, and without notice of the fraud, and cannot claim the rights of such in this suit.

The next question is whether the decision of the Secretary of the Interior directing these claims to be passed to patent is conclusive in this suit. It was settled by the Supreme Court in U. S. v. Minor, 114 U. S. 233, 5 Sup. Ct. 836, 29 L. Ed. 110, that the government has the same remedy to set aside a patent for land on the ground of fraud in procuring it as an individual would have to annul his deed under like circumstances, and that the decision of the Department in passing

the claim to patent is not conclusive when such decision was obtained by fraud. Now, the action of the Secretary of the Interior in directing these claims to be passed to patent was based upon the reports of Special Agents and the accompanying ex parte affidavits of the several claimants, and Puter, McKinley, and Kribs. It was clearly shown on the trial that these affidavits were false, and did not state the actual facts in the case, and they were known to be such to Kribs, the agent and representative of Smith. Indeed, the testimony in this case strongly shows that one of the special agents was corrupted by Kribs, and that the applicants were coached by him or with his knowledge and consent to make the false affidavits. He admitted upon the trial that his own affidavit did not state the actual facts of the transaction, but was an attempt on his part to make it appear that his connection with the matter was the mere loaning of money to the several applicants with which to make the final proof, and that the purchase of the land was an independent transaction with which he had no connection. Having thus induced the Secretary of the Interior to pass these claims to patent upon false and fraudulent testimony, with knowledge of its character, it certainly cannot be successfully contended that the decision of that officer is conclusive upon the government. Having knowingly obtained such decision by perjury and subornation of perjury, it cannot be relied upon as a defense.

The next, and what I deem the most important and difficult, question in this case is the statute of limitations. The statute provides that:

"Suits by the United States to vacate and annul patents heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patent." Act March 3, 1891, c. 559, 26 Stat. 1093 (U. S. Comp. St. 1901, p. 1521).

These suits were not commenced against the Linn & Lane Timber Company until more than six years after the date of the issuance of the patents. As a general rule, the holder of the legal title is an indispensable party to a suit to set aside a patent (U. S. v. Winona & St. P. R., 67 Fed. 948, 15 C. C. A. 96; U. S. v. C. P. R. R. [C. C.] 11 Fed. 449), and the statute of limitations does not cease to run in his favor until he is made a party to the suit and process issued and placed in the hands of the marshal with the bona fide intent that it shall be served. Miller v. McIntyre, 6 Pet. 61, 8 L. Ed. 320. But the identity of Smith and the Linn & Lane Timber Company and their relation to the title to the property in controversy is such that I do not think the rule should be applied in this case. Smith is the real party in interest and the beneficial owner of the property. The corporation was organized by him as a mere holding concern. He owned all of its capital stock. He and the members of his family composed its board of directors, and were the officers of the corporation. In fact, Smith was the corporation and the corporation was Smith. The question of the statute of limitations should be therefore determined by the time the suit was commenced against Smith and the holders of the record title, and not against the mere holding corporation. If, prior to the commencement of these suits, Smith had conveyed or

caused the property to be conveyed to some natural person in trust for him, but had withheld the deeds from record and kept the matter secret until the six years had expired, it would hardly be contended that the action is barred, and no greater effect should be given to the organization of the corporation and the deeds to it. The suit was commenced against Smith when the warning order was issued to him and placed in the hands of the proper officer for service. U. S. v. Lumber Co. (C. C.) 80 Fed. 309, and 85 Fed. 827, 29 C. C. A. 431. At that time the statute had not run except as to the eight patents issued July 9, 1902. As to them, the suit is barred, for in my judgment the statute begins to run from the date of the issuance of the patent, and not from the discovery of the fraud. The language of the statute is plain and leaves no room for construction. It says suits of the United States to vacate or annul patents shall only be brought within six years after the issuance of patent. As said by Mr. Justice Gilbert, in speaking for the Circuit Court of Appeals for the Ninth Circuit, in 85 Fed., 29 C. C. A., supra:

"There is no room for construction. It is clear that Congress has said that all suits by the United States to vacate patents shall be brought within the period limited by the act."

The object of this statute is to extinguish any right the government may have in the land and vest a perfect title in the adverse holder after six years from date of the patent, regardless of any mistake or error in the Land Department, or the fraud or imposition of the patentee. U. S. v. Winona & St. P. R. R., 165 U. S. 463, 17 Sup. Ct. 368, 41 L. Ed. 789; U. S. v. Chandler-Dunbar Co., 209 U. S. 447, 28 Sup. Ct. 579, 52 L. Ed. 881.

A point is made of the fact that subsequent to the organization of the corporation, and before the filing of the original bills of complaint in these suits, Smith had sold 15 shares of the capital stock and pledged other shares to secure payment of an indebtedness of his, but this does not change the status of the matter or the rights of the parties to these suits. We are not concerned at this time with the status of the stockholders, but with the corporation itself. It is still the holder of the title, and has not disposed of it to a bona fide purchaser for value. It is admitted that it took title charged with whatever infirmities existed in the hands of Smith. It is therefore in no sense a bona fide purchaser or entitled to the protection of such, but is a mere holding corporation organized by Smith to suit his convenience and as a holder of the legal title for his use and benefit. Smith is a party to the suit, and it was commenced against him within six years from the date of issuance of all the patents except those issued in July, 1902, and I do not think that the defendants, either the corporation or Smith, can under these circumstances urge this statute as a bar to these suits, when it appears in the testimony that, after the property had been conveyed to the corporation by Smith, the deeds were retained by him, and the transfer not made public until after the statute of limitations had run.

I am aware that the soundness of this conclusion is not free from doubt, but I believe it to be in accordance with equity, justice, and sound reason.

When these cases were called for trial, the complainant made an application to amend the bills of complaint by alleging the value of the property involved, so that it might recover damages for the fraud in case it should be unable to obtain the primary relief prayed for in the bills. The ruling on this motion was reserved until the final decision in the case with permission to the government to give testimony upon the hearing in reference to the value of the property. I am now of the opinion that the amendment should not be allowed. The suit to set aside and vacate the patents on the ground of fraud is inconsistent with a claim for damages on account of such fraud. The one proceeds in disaffirmance of the transaction and the other in affirmance of it. Again, a suit to vacate a patent is equitable in its nature, while a proceeding to recover damages is legal, and the two therefore cannot be joined in the same suit. If the government has a cause of action against the defendants or any of them for damages on account of the fraud, it is a legal action, and should be brought on the law side of the court.

It follows from these views that the complainant is entitled to the relief demanded, except as to the patents issued in July, 1902, and decrees will be entered accordingly.